FILED
JUN 23 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTH STAR ALASKA HOUSING CORPORATION,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 08-460 C

## COMPLAINT

Plaintiff North Star Alaska Housing Corporation alleges:

## INTRODUCTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491, *et seq.* and 41 U.S.C. § 601, *et seq.*

## THE PARTIES

2. The plaintiff is North Star Alaska Housing Corporation ("North Star"), an Alaska corporation with its principal offices at 937 Harvard Avenue East, Seattle, Washington 98102.

3. The defendant is the United States of America, acting through officials representing the Secretary of the Army and the Chief of the Army Corps of Engineers (the "Government").

## NATURE OF THE ACTION

4. This is an action for breach of contract arising out of the Lease agreement between North Star and the Government for the 400-unit Army housing complex on Fort Wainwright, Alaska known as Birchwood Homes or Birchwood Property (the "Lease") which

was entered into by virtue of the authority of 10 U.S.C. § 2828, as amended by Section 801 of Public Law 98-115 ("Section 801"). Section 801 introduced privatization into the military housing market, and represents an effort by Congress to ensure that soldiers and their families receive quality, safe, affordable, and convenient housing options that had been lacking when military housing was exclusively Government-run.

5. As set forth below, and as found by this Court in its Opinion dated April 2, 2007, in *North Star Alaska Housing Corporation v. The United States*, Nos. 98-168C, 02-1632C and 03-2699C (the "Opinion"), the Government has breached its Lease with North Star and has acted in bad faith in resolving disputes related to its administration of the Lease.

6. Prerequisite jurisdictional matters with respect to the filing of this Complaint and with respect to the claims asserted in this Complaint have been met. By letter dated August 23, 2007, North Star submitted to the Contracting Officer a certified claim in the sum certain amount of $1,887,822.04, and requested a final decision within 60 days. (A copy of this claim letter, without attachments, is Exhibit A, hereto.) North Star's claim consists of the following seven (7) major claim areas and is based in large part on the declaratory rulings set forth in the Opinion: Rent Abatements; Unpaid Occupant Damages; Incentive Fees; Depreciation; Cost Book Approval; Additional Payroll; and Outstanding Overhead and Margin.

7. The Government has issued four separate contracting officer final decisions relating to North Star's August 23, 2007 claim.

8. By letter dated October 19, 2007, the Contracting Officer requested a total of six months, until February 27, 2008, to make a decision on the majority of North Star's claims in order to conduct an audit of the matters, notwithstanding that the very same matters were the

subject of substantial investigation by the Government when the contractual issues were previously before the court. The Defense Contract Audit Agency ("DCAA") audit that ensued appeared to be conducted without the benefit of the information previously gathered by the Government during the 2005 trial and the Contracting Officer did not direct the DCAA auditor to review the court's Opinion prior to initiating the audit.

9. By letter dated October 25, 2007, ( Exhibit C) the Contracting Officer issued a final decision ("COD") on North Star's claims relating to Rent Abatements (years 2002, 2003 and 2005), and on the following portions of North Star's claims relating to Unpaid Occupant Damage: Matching Carpet Unit 884; Carpet and Vinyl Unit 883; Gutter Downspout Unit 638; Carpet and Counter Unit 961; Repainting Bathroom Unit 961; Water Damage Units 1006,1229 and 952; and Floor Matching Unit 623. The Contracting Officer awarded North Star a sum total of $62,474.35 for the claims addressed in the COD and further found that North Star should receive interest on the principle amount awarded from the date of the receipt of North Star's COD request (August 27, 2007) until paid.

10. On December 7, 2007, the contracting officer issued another partial final decision addressing Part C of North Star's August 23, 2007 claim, concerning "Incentive fees for the years 1995, 1996 and 2002-2006." (Exhibit D). Of the $338,056.45 claimed amount addressed in the December 7, 2007 final decision, the contracting officer awarded $268,048.22, plus CDA interest from August 27, 2007 until paid.

11. Not until March 12, 2008, 203 days after submission of the claim, did the contracting officer issue another partial final decision addressing all remaining items in North Star's August 23, 2007 certified claim, including matching surfaces, wall repairs, stove

replacements, carpet, depreciation, cost book approval, additional payroll, outstanding overhead and margin, and additional 40% overhead. (Exhibit E) Of the $1,454,654.00 claimed amount addressed in the March 12, 2008 final decision, the contracting officer awarded $870,404.00, plus CDA interest from August 27, 2007 until paid.

12. By letter dated April 29, 2008, North Star requested the contracting officer to reconsider portions of her December 7, 2007 and March 12, 2008 final decisions. (Exhibit F, without attachments) Specifically, with regard to the December 12, 2008 final decision, North Star indicated it was entitled to incentive fees for all of 2006 and a 2007 incentive fee prorated through May 2007, for a total award of $98,480.69. Since the December 7, 2007 final decision only granted an award of $36,549.55 for 2006 and none for 2007, North Star requested that an additional incentive fee award of $61,913.14 be granted. With regard to the March 12, 2008 final decision, North Star indicated that it was entitled to an additional award of $104,028.84 for occupant damaged stoves, $167,728.64 for occupant damaged carpet carpet, and $202,310.00 for additional payroll costs. Thus, North Star's April 29, 2008 letter asked the contracting officer to reconsider her previous decisions and award a total additional amount of $535,980.62, plus CDA interest from August 29, 2007 until paid. (Exhibit F).

13. In response to North Star's request for reconsideration of the December 7, 2007 and March 12, 2008 final decisions, the contracting officer issued another final decision on June 2, 2008 (received June 6, 2008). (Exhibit G). In this final decision, the contracting officer awarded North Star an additional $1,789.00, to correct a calculation error in her March 12, 2008 final decision relating to additional overhead and margin on occupant damaged stoves. With regard to the other claim items identified in North Star's April 29, 2008 request for

reconsideration, the contracting officer declined to award any additional damages. Thus, the total amount that remains in dispute is $534,191.63 [$535,980.62 - $1,789.00 = $534,191.63].

14. Pursuant to the March 12, and June 2, 2008 decision referenced above, North Star has been paid to date only $633,703.59 out of the $872,193 awarded. Ten months have passed since the filing of North Star's claim with the contracting officer and CDA interest on a majority of amounts paid remains due and, of the amounts awarded, $238,489.41 remains unpaid. Despite several requests, the contracting officer has not provided a time when the balance will be paid.

15. North Star hereby timely appeals the contracting officer's June 2, 2008 final decision.

## FACTUAL ALLEGATIONS

### I. Unpaid Occupant Damage – Stoves and Carpet

16. Contrary to the terms of the Lease, the Government instituted a practice of failing to correct occupant damage so that it would be viewed, upon the next tenant change over, as normal wear and tear. The Government also wrongfully required the matching of items that were adjacent to replaced items.

17. In the Opinion, this Court found that these and other practices constituted a breach of the Lease and the covenant of good faith and fair dealing. Opinion 63-64, 69-70, 85.

18. North Star has incurred additional costs as a direct result of these Government actions which required North Star to replace occupant damaged stoves and replace occupant damaged carpet. Of the $110,755.84 claimed for occupant damaged stove replacements, the contracting officer has awarded $8,516.00, leaving $102,239.84 in dispute despite substantial

justifications provided by North Star. Contrary to the court's opinion, the contracting officer has refused to recognize any North Star entitlement for occupant damaged carpet despite substantial justifications provided by North Star, leaving the entire claimed amount of $167,728.64 in dispute. Thus, North Star is entitled to recover an additional $269,968.48 for unpaid occupant damage relating to stoves and carpet [$102,239.84 + $167,728.64 = $269,968.48].

**II. Incentive Fees**

19. Article VII of the Lease provides that the Government may pay North Star an "incentive fee" of up to five percent of the maintenance rent for the period of time for which North Star's performance is found by the Government to substantially exceed the established standards of the Lease.

20. In the Opinion, this Court found that the "incentive fee decisions made for 1995 and years subsequent in suit must be set aside as arbitrary and capricious." Opinion 66. The Court further found that it only had monetary jurisdiction over the incentive fee awards for the years 1997 through 2001.

21. North Star is also entitled to recover its full incentive fee award for all of 2006 and a 2007 incentive fee prorated through May 2007, for a total award of $98,480.69. The Government has only granted an award of $36,549.55 for 2006 and none for 2007. The Government has provided no reason for denying the full Incentive Fee awards for 2006 and 2007. Accordingly, North Star is entitled to an additional incentive fee award of $61,913.14.

## III. Additional Payroll

22. During the term of the Lease, the Government began increasing North Star's downtime by improperly stockpiling units for same day release, failing to provide adequate notice of inspections, failing to provide work authorizations, failing to provide additional time for extensive repair work and by the improper use of extra-contractual inspections.

23. In the Opinion, the Court found that North Star was entitled to a declaration "regarding the correctness of its interpretations of the Lease, and the requirements of the covenant of good faith and fair dealing, with respect to the enumerated actions that increased downtime and otherwise increased North Star's costs." Opinion 85. See also Opinion 51-57 and Fact Appendix II.

24. North Star has incurred additional payroll costs due to the additional accounting and scheduling burdens caused by the various Government breaches and it is entitled to recover these costs from the Government. The Contracting Officer determined that North Star should be compensated for the additional payroll costs, but made errors in its calculations of those costs. Of the $424,636 claimed by North Star for additional payroll, the contracting officer calculated an award of only $222,426, despite the fact that North Star provided evidence of its actual expenses to the auditor, leaving $202,310 in dispute.

## COUNT I

## BREACH OF CONTRACT

25. Paragraphs 1 through 24 above are incorporated by reference as if fully set forth herein.

26. The Government has continued to breach its Lease with North Star, as set forth above and as found in the Opinion.

27. As a direct and proximate result of the Government's breaches, North Star has suffered damages in an amount of $534,191.63.

## COUNT II

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

28. Paragraphs 1 through 27 above are incorporated by reference as if fully set forth herein.

29. The Lease and other contract documents carry with them the obligation of the parties to conduct their affairs in good faith and to deal fairly with each other.

30. The Government's conduct under the Lease, set forth above and as found in the Opinion, is in direct violation of its duty of good faith and fair dealing.

31. As a direct and proximate result of the Government's conduct, North Star has suffered damages in an amount of $534,191.63.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands judgment against defendant as follows:

(A) Damages in an amount of $534,191.63;

(B) Appropriate interest, attorneys' fees, and costs; and

(C) Such other and further relief as the Court deems just and proper.

Dated: June 23, 2008

Respectfully submitted,

Paul W. Killian / Thomas P. McLish

PAUL W. KILLIAN

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Counsel for Plaintiff

**CERTIFICATE OF FILING**

I hereby certify that a true and correct copy of the foregoing Complaint was served by first-class U.S. mail, postage pre-paid, this 23rd day of June 2008, on:

Timothy P. McIlmail
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th floor
1100 L Street, NW
Washington, DC 20530

Attorney for Defendant

Mary Ellen Moltumyr
Mary Ellen Moltumyr

# EXHIBIT A

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 23, 2007

VIA OVERNIGHT MAIL

Ms. Veronica Hiriams
Contracting Officer
Department of the Army
U.S. Army Engineers District, Alaska
P.O. Box 6898
Anchorage, AK 99506-0898

Re: Contract Disputes Act Claim; Request for a Contracting Officer's Final Decision

Dear Ms. Hiriams:

Pursuant to Lease No. DACA: 85-5-88-17, entered into between North Star Alaska Housing Corporation ("North Star") and the United States of America ("Government") on November 6, 1987, North Star hereby submits this Contract Disputes Act ("CDA") certified claim in the sum certain amount of $1,887,822.04. As is more fully described below, this claim is based in large part on the declaratory rulings set forth in the April 2, 2007, decision of the United States Court of Federal Claims ("Court") in *North Star Alaska Housing Corporation v. The Untied States,* Nos. 98-168C, 02-1632C and 03-2699C (herein "the Decision" ). A signed certification and relevant supporting data are attached hereto.

North Star respectfully requests $1,887,822.04 on its claims, along with CDA interest from the date of this submission. A Final Decision on this claim is hereby requested within sixty (60) days from your receipt of this letter.

**CLAIM SUMMARY**

The total claim amount of $1,887,822.04 consists of the following seven (7) major claim areas, each of which is discussed in more detail in the body of this letter. With regard to rent deductions, the damages claimed are the actual amount of monthly rent improperly withheld by the Government and not awarded in the Decision or claimed in the '04 and '05 cases before the Court. With regard to incentive fees, the damages claimed are the amounts that have not been awarded to North Star. For certain individual claim elements, reasonable estimates of the damages have been prepared based on North Star's recorded expenditures and/or the estimates of North Star personnel. The summary of claim is as follows:

North Star Alaska
Housing Corporation

A Fischer Properties Company

| Claim ID | Claim | Total Claim |
|---|---|---|
| A | Rent Abatements | $59,394,37 |
| B | Unpaid Occupant Damages | $409,965.07 |
| C | Incentive Fees | $338,056.45 |
| D | Depreciation | $578,112.00 |
| E | Cost Book Approval | $ 17,359.09 |
| F | Additional Payroll | $458,078.06 |
| G | Outstanding Overhead and Margin from 1998-2005 | $ 26,917.00 |
| Total | | 1,887,822.04 |

**A. RENT ABATEMENTS**

As found by the Court on page 64 of the Decision, beginning in 2002, the Government invoked Sections H.1.(c) and H.1.(d) of the maintenance annex to improperly assess liquidated damages against North Star. The Court also found at page 85 of the Decision that North Star was "entitled to recover the costs associated with rent abatements (liquidated damages)." The improper rent abatements which form the basis of this claim total $59,394.37 and are listed in Tab A, hereto.

**B. UNPAID OCCUPANT DAMAGE**

As discussed in the Decision at page 63, the Government instituted a practice of failing to correct occupant damage so that it would be viewed, upon the next tenant change over, as normal wear and tear. The Government also required the matching of items which were adjacent to replaced items, such as carpeting and countertops. The Court found these and related Government practices to be improper. See Decision, pages 63, 69-71 and 85, and Fact Appendix 1 and 2. This portion of North Star's claim relates to these improper Government actions and consists of 12 items, described in more detail in Tab C, hereto. The total amount of this claim relating to general occupant damage is $409,965.07.

**C. INCENTIVE FEE**

Article VII of the Lease provides that the Government may pay North Star an "incentive fee" of up to five percent of the maintenance rent for the period of time for which North Star's performance is found by the Government to substantially exceed the established standards of the Lease. The Court found on page 66 of the Decision that the "incentive fee decisions made for 1995 and years subsequent in suit must be set aside as arbitrary and capricious."

Because the Court had monetary jurisdiction over the incentive fee awards for the years 1997 through 2001, this claim addresses the years 1995, 1996, 2002- 2006. See Tab C, hereto. The total amount of the claim for unawarded incentive fees is $338,056.45.

**D. DEPRECIATION**

The Court, on pages 60-63 of the Decision, found that the Government's imposition of a depreciation schedule with respect to carpet damage, countertops, vinyl and other items was contrary to the Lease and applicable case law, violated the covenant of good faith and fair dealing and constituted bad faith. See also page 85 of the Decision where the Court found that North Star was entitled to a declaration regarding "the depreciation of carpeting and other items." In accordance with these findings, North Star submits this claim for the Government's improper withholding of depreciation in the amount of $578,112. Additional detail concerning the calculation of these damages is set forth in Tab D.

**E. COST BOOK APPROVAL**

The Court, on pages 63-64 of the Decision, found that the Government unilaterally altered the process for preparing work authorizations and improperly removed items from the List of Repair Costs. As a result of these actions and the Government's failure to properly approve the Cost Book, North Star was damaged. The total amount of this claim, as is more fully detailed in Tab E, hereto, is $17,359.09.

**F. ADDITIONAL PAYROLL**

The Court, on page 85 of the Decision, found that North Star was entitled to a declaration regarding "the correctness of its interpretations of the Lease, and the requirements of the covenant of good faith and fair dealing, with respect to the enumerated items that increased downtime and otherwise increased North Star's costs." As found by the Court on pages 51-57 of the Decision, the items that increased downtime included, but were not limited to, stockpiling of

units for same day release, failure to provided adequate notice of inspections, failure to provide work authorizations, failure to provide additional time for extensive repair work and improper use of extra-contractual inspections. See also Decision, Fact Appendix 2. North Star incurred additional payroll costs due to the additional accounting and scheduling burdens caused by the various Government breaches found by the Court in its Decision. As set forth in Tab F, hereto, North Star's claim for additional payroll costs totals $458,078.06.

## G. OUTSTANDING OVERHEAD AND MARGIN

The Lease entitles North Star to reasonable overhead for manhour costs expended to repair damage to property above normal wear and tear, but the Government engaged in the practice to exclude overhead. The Court found on page 94 of its Decision that although this issue was raised by North Star in its September 4, 2002 letter, the Court lacked monetary jurisdiction over this claim for a failure to state a sum certain. As previously noted, however, on page 85 of the Decision, the Court found that North Star was entitled to a declaration regarding "the correctness of its interpretations of the Lease, and the requirements of the covenant of good faith and fair dealing, with respect to the enumerated items that increased downtime and otherwise increased North Star's costs." Accordingly, North Star is claiming the overhead and margin that was improperly withheld from it during the years 1998-2005. This claim totals $26,917.00, and is more fully detailed in Tab G, hereto.

## CONCLUSION

In light of all of the above, North Star hereby demands payment from the Government of $1,887,822.04, with interest from the date of this submission. Your Final Decision is requested within sixty (60) days from the date received or North Star shall deem this claim denied.

Sincerely,

Rhonda Sekyra
Secretary/Treasurer

Enclosures

**CERTIFICATION**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Rhonda Sekyra
Secretary/Treasurer

***Summary of CDA Claims***

| Claim ID | Claim | Total Claim | |
|---|---|---|---|
| A | Rent Abatements | $ | 59,394.37 |
| B | Unpaid Occupant Damages | $ | 409,905.07 |
| C | Incentive Fees | | $338,056.45 |
| D | Depreciation | $ | 578,112.00 |
| E | Cost Book Approval | $ | 17,359.09 |
| F | Additional Payroll | $ | 458,078.06 |
| G | Outstanding Overhead and Margin from 1998-5/2000 | $ | 26,917.00 |
| **Total** | | **$** | **1,887,822.04** |

# EXHIBIT B

**DEPARTMENT OF THE ARMY**
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

CERTIFIED MAIL

OCT 25 2007

Office of Counsel

North Star Alaska Housing Corporation
ATTN: Ms. Rhonda Sekyra
937 Harvard Avenue East
Seattle, WA 98102-4532

Re: Contracts DACA85-1-86-71 (Outlease), DACA85-9-86-27 (Agreement to Lease) and DACA85-5-88-17 (Lease), Fort Wainwright, Alaska

Dear Ms. Sekyra:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding the claim for Rent Abatement (years 2002, 2003 and 2005), Matching Carpet Unit 884, Carpet and Vinyl Unit 883, Gutter Downspout Unit 638, Carpet and Counter Unit 961, Repainting Bathroom Unit 961, Water Damage Units 1006, 1229 and 952, and Floor Matching Unit 623 on Fort Wainwright, Alaska.

Originally I hoped to complete my assessment of the incentive fees claims in this decision. Unfortunately, more time is needed to complete a fair and impartial assessment of the claim. I will issue a COD on incentive claims on 30 November 2007.

If you have any questions about the enclosed COD, please contact Ms. Anne L. Burman of our Office of Counsel at (907) 753-2532.

Sincerely,

Veronica A. Hiriams
Chief, Real Estate Division
Contracting Officer

Enclosure

Copy Furnished:

CEPOA-RE (Official Contract File)

# FINDINGS OF FACT TO ACCOMPANY CONTRACTING OFFICER'S DECISION

**Rent Abatement (years 2002, 2003 & 2005)**
**Matching Carpet Unit 884**
**Carpet & Vinyl Unit 833**
**Gutter Downspout Unit 638**
**Carpet & Counter Unit 961**
**Repainting Bathroom Unit 961**
**Water Damage Units 1006, 1229 and 952**
**Floor Matching Unit 623**

**CONTRACT NUMBERS:** DACA85-1-86-71 (Outlease)
DACA85-9-86-27 (Agreement to Lease)
DACA85-5-88-17 (Lease)

**NAME AND ADDRESS OF CONTRACTOR:** North Star Alaska Housing Corporation
937 Harvard Avenue East
Seattle, WA 98102-4532

**CONTRACT DESCRIPTION:**

To design and construct 400 family housing units for military personnel and their families on Fort Wainwright, Alaska, pursuant to the Military Construction Authorization Act of 1984, 10 U.S.C. § 2828(g), as amended by the Military Construction Authorization Act of 1986, P.L. 99-167, Sec 801.

The outlease is a lease of government property on Fort Wainwright to the developer, beginning on June 27, 1986, for a period of 32 years, subject to termination clauses.

The Agreement to Lease provided for the Government to lease back the property, including the 400 housing units and related structures and improvements, upon completion of the project.

The Lease between North Star Alaska Housing Corporation (hereinafter North Star) and the Government is for a period of 19 years and six months, beginning November 6, 1987.

**CONTRACT AMOUNT:**

The contract amount is determined to be the combined annual total of the shelter rent and the maintenance rent costs of the 400 units over the life of the Lease. That amount excludes Work Authorization repairs and utility charges, which are paid separately by the Government. Adjustments are allowed for fluctuations in the costs of maintenance and real estate taxes.

**AMOUNT IN DISPUTE:**

| | |
|---|---|
| $ 59,394.37 | - Rent Abatement |
| $ 1,674.00 | - Matching Carpet Unit 884 |
| $ 3,478.00 | - Carpet & Vinyl Unit 833 |
| $ 40.00 | - Gutter Downspout Unit 638 |
| $ 1,386.00 | - Carpet and Counter Top Unit 961 |
| $ 179.00 | - Repainting Bathroom in Unit 961 |
| $ 18,308.00 | - Water Damage Units 1006, 1229 & 952 |
| $ 1,183.00 | - Floor Matching Unit 623 |
| $85,642.37 | + 40% additional overhead on $26,248.00 + Interest |

**THE DISPUTE:**

North Star requests payment from the Government of $1,887,822.04 consisting of seven major claim areas (Parts A – G) as shown in their claim dated August 23, 2007. North Star also requests Contract Disputes Act (CDA) interest from the date of submission of the claim. The total sum claimed of $1,887,822.04 includes an additional 40% overhead requested for Part B and Parts D-F of the claim. This partial decision pertains only to the following parts of the claim:

**Part A, Rent Abatement** for which North Star alleges the Government improperly assessed liquidated damages during the period of 2002, 2003 and 2005.

**Part B-2, Matching Carpet Unit 884** for which North Star contends that replacing blue carpet with brown carpet is acceptable since the blue carpet was no longer available and past practice had allowed the use of brown carpet even though there were other colors of carpet elsewhere in the unit.

**Part B-3, Carpet & Vinyl Unit 833** for which North Star contends the replacements were due to occupant damages.

**Part B-4, Gutter Downspout Unit 638** for which North Star contends the replacement was due to occupant damage.

**Part B-5, Carpet & Counter Top Unit 961** for which North Star contends the occupants had damaged the carpet and counter tops to the extent they should be replaced.

**Part B-6, Repainting Bathroom Unit 961** for which North Star contends the bathroom had already been properly painted and did not require a repainting.

**Part B-12, Water Damage Units 1006, 1229 & 952** for which North Star contends that the occupant's conduct caused the water damage to Unit 1006, the Government's failure to regularly inspect the vacant unit led to escalation of the damages in Unit 1229, and that water damages to Unit 952 were a result of the Government's failure to inform North Star of a problem with the toilet in the upstairs master bathroom.

**Part B-13, Floor Matching Unit 623** for which North Star contends that the carpet replaced by the Government's contractor was not compatible in kind and color with the adjacent carpet.

**PERTINENT CORRESPONDENCE:**

1. Reserved.
2. Reserved.
3. Opinion of the United States Court of Federal Claims in North Star Alaska Housing Corporation v. The United States, Nos. 98-168C, 02-1632C and 03-2699C, filed April 2, 2007.
4. CDA Claim; Request for Contracting Officer's Final Decision (COD) dated August 23, 2007; Parts A, B-2 thru B-6, B-12, and B-13.
5. CDA Claim; Request for COD, dated August 23, 2007, Letter of Transmittal.
6. COD, dated September 23, 2005, Water Damaged Unit 1006.
7. COD, dated September 26, 2005, Water Damaged Unit 1229.

8. Request for COD, dated August 11, 2003; Gutter Downspout Unit 638 and letter response dated September 22, 2003.
9. COD, dated September 29, 2003, Re-painting of Bathroom Unit 961.
10. COD, dated August 11, 2003, Carpet and Counter Top Unit 961.
11. COD, dated December 16, 2002, Carpet & Vinyl Unit 833.
12. COD, dated October 23, 2002, Matching Carpet Unit 884.

**PERTINENT CONTRACT PROVISIONS:**

13. Lease Exhibit C, Sec. C. 1(s), Damages Caused by Occupants.
14. Lease Exhibit C, Sec. C. 1(w), Major Unforeseen, Unscheduled Work.
15. Lease Exhibit C, Sec. E. 8(c), Workmanship.
16. Lease Exhibit C, Sec. H.1(c) and H.1(d).

**FINDINGS OF FACT:**

**Rent Abatement** - North Star has requested reimbursement for actual amount of rent reductions of monthly rent withheld by the Government and not awarded in the Court's Opinion filed April 2, 2007 or claimed in the '04 and '05 cases. This request is for an amount of $59,394.37, plus interest for the periods as depicted in the Chart attached as Part A of the claim dated August 23, 2007.

Beginning in 2002, the Government invoked Sections H.1.(c) and H.1.(d) of the Maintenance Annex to the Lease, assessing liquidated damages against North Star for each calendar day in excess of the allowable change of occupancy downtime. As stated on page 64 of the Court's Opinion filed 2 April 2007, in the court's view, these assessments cannot stand. Also on page 85 of the Court's Opinion, North Star is entitled to recover the costs associated with rent abatements.

It appears that the first two rent abatements (August 2005 and July 2005 totaling $3,406.28), listed in the chart of Part A of the Request for COD, relate to liquidated damages taken by the Government for downtime due to flood repairs of Units 1006 and 1229. COD for flood damage repairs of Units 1006 and 1229 were sent to North Star on September 26, 2005. The remainder of the rent abatements listed in Part A of the COD request dated August 23, 2007 (totaling $55,988.09) were a direct result of what the Government considered to be excess change of occupancy downtime.

**Matching Carpet Unit 884** - North Star has requested reimbursement to replace carpet in Unit 884 for the sole purpose of matching kind and color of adjacent carpet. Costs claimed are $1,674.00 (including 10% overhead and 10% profit), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. North Star originally requested reimbursement for this carpet replacement by COD request dated October 23, 2002. The COD dated November 20, 2002 found that North Star had the option of either replacing the damaged carpet with blue carpet that was compatible with the adjacent undamaged carpet, or replacing the undamaged carpet with the same brown carpet used to replace the damaged carpet. Page 69 of the Court's Opinion finds that the Army was responsible for the cost of replacing the carpeting in Unit 884.

**Carpet & Vinyl Unit 833** – North Star has requested reimbursement to replace damaged carpet and vinyl in Unit 833. Costs claimed are $3,478.00 (including 10% overhead and 10% profit), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. North Star originally requested reimbursement for this flooring replacement by a COD request dated December 16, 2002. The COD dated February 14, 2003 found North Star to be financially responsible for the replacement of flooring due to cracks in the vinyl and failure of

previous repairs to the carpet as well as the age of the flooring. Page 70 of the Court's Opinion finds that the Army, and not North Star, should be responsible for the cost.

**Gutter Downspout Unit 638** – North Star has requested reimbursement to replace a damaged gutter down spout for Unit 638. Costs claimed are $40.00 (including 10% overhead and 10% profit), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. North Star originally requested reimbursement for this replacement by a COD request dated August 11, 2003. By letter dated September 22, 2003, the Contracting Officer declined a decision stating this issue, among others, was pending before the Court of Federal Claims (COFC). Page 85 of the Court's Opinion reflects that North Star is entitled to declaratory relief regarding the gutter down spout in Unit 638.

**Carpet and Counter Top Unit 961** – North Star has requested reimbursement for damaged carpet and counter top in Unit 961. Costs claimed are $1,386.00 (including 10% profit and 10% overhead), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. North Star originally requested reimbursement for this replacement by COD request dated August 11, 2003. By letters dated September 22, 2003 and October 21, 2003, the Contracting Officer declined a decision stating this issue was pending before the COFC. Page 91 of the Court's Opinion reflects that jurisdiction is lacking for monetary claims on this issue.

**Repaint Bathroom Unit 961** – North Star has requested reimbursement for the costs associated with repainting the bathrooms in Unit 961. Costs claimed are $179.00 (including 10% overhead and 10% profit), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. North Star originally requested a COD with regards to financial responsibility for repainting the bathrooms by a COD request dated August 11, 2003. The

Contracting Officer rendered a decision on September 29, 2003, stating that North Star had the financial responsibility for repainting the bathrooms. Page 85 of the Court's Opinion reflects that North Star is entitled to declaratory relief regarding the repainting of bathrooms in Unit 961.

**Water Damage Units 1006, 1229 and 952** – North Star has requested reimbursement for costs associated with water damage repairs to these three units. Costs claimed for all three units total $18,308.00; (including 10% overhead and 10% profit), plus an additional 40% overhead, plus CDA interest from date of submission of this claim. A COD concerning Unit 1006 was signed on September 23, 2005 and mailed on September 26, 2005. The disputed amount totaled $16,473.92 ($1,922.90 rent reduction + $14,551.02 repair cost). The Contracting Officer (CO) found neither the Government nor the occupant at fault and denied the claim. A COD concerning Unit 1229 was signed and mailed on September 26, 2005. The disputed amount totaled $4,546.05 ($1,483.38 rent reduction + $3,062.67 repair cost). The CO found neither the Government nor the occupant at fault and denied the claim. The CDA which governs both of these claims required North Star to appeal these decisions either to the Armed Forces Board of Contract Appeals (ASBCA) within 90 days or to the COFC within 12 months. A COD concerning Unit 952 water damages was signed on March 19, 2004. The disputed amount was not specified in the request for COD. This COD was appealed to the COFC in the 2004 Case No. 04-1396C and is addressed in the Settlement Agreement signed September 26, 2007.

**Floor Matching Unit 623** – North Star has requested reimbursement for costs to replace carpet that was installed by the Government's contractor and which North Star believes did not match existing carpet in kind and color. Costs claimed for this unit total $1,183.00 (including 10% overhead and 10% profit) plus an additional 40% overhead, plus CDA interest from date of submission of this claim. A COD denying North Star's claim was issued on October 29, 2004.

The COD was appealed to the COFC in the 2005 Case No. 05-930C and is addressed in the Settlement Agreement signed September 26, 2007.

**CONCLUSION:**

**Rent Abatement** – In regards to the statements of the Court's Opinion, dated April 2, 2007, on page 64, "In the court's view, these assessments cannot stand," and page 85, "plaintiff is entitled to recover the costs associated with rent abatements (liquidated damages)," it is believed by the CO that these statements refer to the rent abatements collected by the Government as liquidated damages associated with what the Government believed to be excess down time for change of occupancy maintenance. Evidence shows that the first two line items listed in the Rent Abatement chart under Part A of this claim relate to liquidated damages taken by the Government for downtime due to flood repairs of Units 1006 and 1229. The COD dated September 23 and September 26, 2005 found neither the occupant nor the Government at fault for the flooding. The CDA which governs these two claims required North Star to appeal these decisions either to the ASBCA within 90 days or to the COFC within 12 months. The claims arising from Units 1006 and 1229 were not part of any of the complaints filed in the court. Thus, the time period to appeal these two has lapsed. I therefore have no authority to further rule on these two previous CODs. However, in accordance with the Court's Opinion dated April 2, 2007, I find that the remainder of the rent abatements listed in Part A of this request for COD were a direct result of what the Government considered to be excess change of occupancy downtime. I therefore find that North Star should be reimbursed $55,988.09, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Matching Carpet Unit 884** – In accordance with page 69 of the Court's Opinion dated April 2, 2007, the Army was responsible for the cost of replacing the carpeting in Unit 884. I

could find no evidence of previous billings by North Star to the Army for this carpeting, however in comparison to carpet replacement billings for other similar Units, the amount of $1,674.00 appears reasonable. I therefore find that North Star should be reimbursed $1,674.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Carpet & Vinyl Unit 833** – In accordance with page 70 of the Court's Opinion dated April 2, 2007, the Army should have been responsible for the cost when the carpet and vinyl were replaced. In accordance with the previous bills on file with the Army and the approved 2002 list of repair costs (price book), I find the claimed amount of $3,478.00 to be reasonable. I therefore find that North Star should be reimbursed $3,478.00, plus CDA interest from the date of receipt of this COD (August 27, 2007).

**Gutter Downspout Unit 638** - In accordance with page 85 of the Court's Opinion dated April 2, 2007, the plaintiff is entitled to declarations regarding the gutter down spout in Unit 638. I therefore find that North Star should be reimbursed $40.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Carpet & Counter Unit 961** – In accordance with page 91 of the Court's Opinion dated April 2, 2007, jurisdiction is lacking for monetary claims. According to the previous billings on file with the Army, I find the claimed amount of $1,386.00 to be reasonable. The Army's unit files, however, show evidence that two amounts were previously authorized for payment when this bill was submitted by North Star in July 2003. The $196.20 was authorized for carpet and $74.54 was authorized for carpet installation on July 12, 2003. This previous payment of $270.74 should be deducted from the total amount of $1,386.00. I therefore find that North Star should be reimbursed $1,115.26, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Repainting Bathroom Unit 961** – In accordance with page 85 of the Court's Opinion dated April 2, 2007, the plaintiff is entitled to declarations regarding the repainting of Unit 961. I therefore find that North Star should be reimbursed $179.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Water Damage Units 1006, 1229 and 952** - In regards to water damage to Units 1006 and 1229, CODs were issued dated 23 September and 26 September 2005. The CDA which governs these claims required North Star to appeal these decisions either to the ASBCA within 90 days or to the COFC within 12 months. The claims arising from Units 1006 and 1229 were not part of any of the complaints previously filed in the court. The time period to appeal these two CODs has lapsed. The CO is without authority to make any further decisions in regards to water damage of Units 1006 and 1229. In regards to Unit 952, this is part of the 2004 Case No. 04-1396C and is addressed in the Settlement Agreement signed on September 26, 2007. No further action will be taken by the CO on Unit 952.

**Floor Matching Unit 623** – This issue is part of the 2005 Case No. 05-930C and is also addressed in the Settlement Agreement signed on September 26, 2007. No further action will be taken by the CO on Unit 623.

In regards to this partial COD, North Star is hereby awarded a sum total amount of $62,474.35 for the claims addressed in this COD. I further find that CDA interest should be paid on the principle amount of $62,474.35 from the date of receipt of this COD request (August 27, 2007) until paid. This decision in no way waives the United States' right to appeal the decision of the Court of Federal Claims in cases numbered 98-168C, 02-1632C and 03-2699 that determined entitlement to some of the claims decided in this document. My determination to pay North Star certain amounts in this document is predicated on the court's determination of

entitlement and is subject to a final judgment in those cases. Should any appeal of the court's decisions be successful for the United States, then the quantum determinations contained in this decision will be null and void. North Star's request for an additional 40% overhead will be addressed in a separate COD that will respond to the additional 40% overhead request for Parts B, D, E and F of North Star's COD request dated August 23, 2007.

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or furnish written notice thereof to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041-3208, within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer, US Army Engineer District, Alaska, P.O Box 0898, Anchorage, Alaska 99506-0898, from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims within 12 months of the date you receive this decision.

The Small Claims Procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount of dispute, as a result of the final decision, is $50,000 or less; and the accelerated procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount in dispute, as a result of this decision is $100,000 or less.

Date: 25 Oct 07

Veronica Hiriams
Veronica Hiriams
Contracting Officer

# EXHIBIT C

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-0898

REPLY TO ATTENTION OF:

CERTIFIED MAIL

DEC 07 2007

Office of Counsel

Received
DEC 10 2007
Fischer Properties

North Star Alaska Housing Corporation
ATTN: Ms. Rhonda Sekyra
937 Harvard Avenue East
Seattle, WA 98102-4532

Re: Contracts DACA85-1-86-71 (Outlease), DACA85-9-86-27 (Agreement to Lease) and DACA85-5-88-17 (Lease), Fort Wainwright, Alaska

Dear Ms. Sekyra:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding the incentive fees in association with the claim for Rent Abatement (years 2002, 2003 and 2005), Matching Carpet Unit 884, Carpet and Vinyl Unit 883, Gutter Downspout Unit 638, Carpet and Counter Unit 961, Repainting Bathroom Unit 961, Water Damage Units 1006, 1229 and 952, and Floor Matching Unit 623 on Fort Wainwright, Alaska.

If you have any questions about the enclosed COD, please contact Ms. Anne L. Burman of our Office of Counsel at (907) 753-2532.

Sincerely,

Veronica A. Hiriams

Veronica A. Hiriams
Chief, Real Estate Division
Contracting Officer

Enclosure

# FINDINGS OF FACT TO ACCOMPANY CONTRACTING OFFICER'S DECISION

## Incentive Fees (1995, 1996 & 2002-2006)

**CONTRACT NUMBERS:** DACA85-1-86-71 (Outlease)
DACA85-9-86-27 (Agreement to Lease)
DACA85-5-88-17 (Lease)

**NAME AND ADDRESS OF CONTRACTOR:** North Star Alaska Housing Corporation
937 Harvard Avenue East
Seattle, WA 98102-4532

**CONTRACT DESCRIPTION:**

To design and construct 400 family housing units for military personnel and their families on Fort Wainwright, Alaska, pursuant to the Military Construction Authorization Act of 1984, 10 USC § 2828(g), as amended by the Military Construction Authorization Act of 1986, P.L. 99-167, Sec 801.

The outlease is a lease of government property on Fort Wainwright to the developer, beginning on June 27, 1986, for a period of 32 years, subject to termination clauses.

The Agreement to Lease provided for the Government to lease back the property, including the 400 housing units and related structures and improvements, upon completion of the project.

The Lease between North Star Alaska Housing Corporation (hereinafter North Star) and the Government is for a period of 19 years and six months, beginning November 6, 1987.

**CONTRACT AMOUNT:**

The contract amount is determined to be the combined annual total of the shelter rent and the maintenance rent costs of the 400 units over the life of the Lease. That amount excludes Work Authorization repairs and utility charges, which are paid separately by the Government. Adjustments are allowed for fluctuations in the costs of maintenance and real estate taxes.

**AMOUNT IN DISPUTE:** $ 10,675.15 – 1995 Incentive Fees
$ 19,835.80 – 1996 Incentive Fees
$ 65,326.59 – 2002 Incentive Fees
$ 66,701.88 – 2003 Incentive Fees
$ 68,660.63 – 2004 Incentive Fees
$ 70,306.85 – 2005 Incentive Fees
$ 36,549.55 – 2006 Incentive Fees
$338,056.45 + CDA Interest

**THE DISPUTE:**

North Star requested payment from the Government of $1,887,822.04 consisting of seven major claim areas Parts (A – G) as shown in their claim dated August 23, 2007. North Star also requests Contract Disputes Act (CDA) interest from the date of submission of the claim. The total sum claimed of $1,887,822.04 includes an additional 40 percent overhead requested for Part B and Parts D-F of the claim. A partial decision was issued on October 25, 2007 for Parts A, B-2 thru B-6, B-12 and B-13. This partial decision pertains only to Part C, Incentive Fees for the years of 1995, 1996 and 2002 - 2006. North Star is requesting the maximum incentive fee allowed by the lease (five percent of the annual maintenance rental) for each of the years of 1995, 1996 and 2002 thru 2006 as shown in Part C of their claim dated August 23, 2007.

**PERTINENT CORRESPONDENCE:**

1. Reserved.
2. Opinion of the United States Court of Federal Claims in North Star Alaska Housing Corporation v. The United States, Nos. 98-168C, 02-1632C and 03-2699C, filed April 2, 2007.
3. CDA Claim; Request for Contracting Officer's Final Decision (COD) dated August 23, 2007; Part C, Incentive Fees.
4. Defendant's Filing of Incentive Fee Decisions, filed with the United States Court of Federal Claims on 21 June 2007.
5. 1995 Incentive Fee Award Correspondence:

   November 27, 1995: Letter from Mr. John Stewart to Mr. Don Kinner.

   December 1, 1995: Letter from Mr. Dennis Klein to Mr. Dennis Wertz.

   December 14, 1995: Memorandum from Mr. Dennis Wertz to Mr. Ed Miller.

December 12, 1995: Memorandum for Record signed by Mr. Klein.

December 16, 1995: Faxed Memo from Mr. Richard Fischer to Mr. Dennis Klein.

January 3, 1996: Letter from Mr. Donald Kinner to Mr. John Stewart.

January 10, 1996: Notice of Award letter from COL Albert J. Kraus to North Star.

January 11, 1996: Letter from Mr. Dennis Wertz to COL Kraus.

January 15, 1996: Correction letter from Mr. Dennis Wertz to COL Kraus.

January 18, 1996: Letter from Mr. Wertz to COL Kraus.

February 14, 1996: Response letter from COL Kraus to Mr. Wertz.

6. 1996 Incentive Fee Award Correspondence:

August 12, 1996: Memo from Tom Petersen to AK Dist. Chief, Real Estate Division.

March 7, 1997: Memo of Record signed by COL WM. David Brown.

April 2, 1997: Memo from Mr. Thomas Petersen to Ms. Karen Goodrich.

April 16, 1997: Notice of Award letter from COL WM. David Brown to Mr. Fischer.

May 22, 1997: Letter from Mr. Fischer to COL WM. David Brown.

May 27, 1997: Letter from Mr. Fischer to COL WM. David Brown.

June 6, 1997: Letter from COL WM. David Brown to Mr. Fischer.

7. 2002 Incentive Fee Award Correspondence:

January 17, 2002: Letter from Rod Everett to Mr. Eldon Wartes.

January 24, 2002: Letter from Mr. Wates to Rod Everett.

April 10, 2002: Letter from Rod Everett to Mr. Wartes.

April 11, 2002: Letter from Mr. Wartes to Rod Everett.

February 20, 2003: Incentive Fee Decision letter from COL Snodgrass to Mr. Fischer.

March 4, 2003: Letter from Mr. Wartes to COL Snodgrass.

March 24, 2003: Letter from Ms. Barbara Lehman to Mr. Wartes.

March 25, 2003: Letter from Ms. Barbara Lehman to Mr. Wartes.

8. 2003 Incentive Fee Award Correspondence:

January 4, 2004: Memo from Connie Kiser to Mr. Eldon Wartes.

February 6, 2004: Letter from Mr. Wartes to Ms. Kiser.

February 18, 2004: Memo from Ms. Kiser to Mr. Wartes.

February 27, 2004: Non-Verbatim Minutes of meeting signed by Ms. Kiser.

March 2, 2004: Letter from Mr. Wartes to Ms. Kiser.

March 9, 2004: Incentive Fee Decision letter from COL Snodgrass to Mr. Fischer.

March 12, 2004: Letter from Ms. Kiser to Mr. Wartes.

March 18, 2004: Letter from Mr. Wartes to Ms. Kiser.

April 28, 2004: Letter from Mr. Wartes to COL Snodgrass.

July 1, 2004: Letter from Ms. Cynthia Larson to Mr. Eldon Wartes.

August 31, 2004: Letter from Mr. Wartes to Ms. Larson.

9. 2004 Incentive Fee Award Correspondence:

May 19, 2005: Letter from Mr. Wartes to Mr. Lucht.

Jun 13, 2005: Letter from Mr. Lucht to Mr. Wartes.

10. 2005 Incentive Fee Award Correspondence:

June 20, 2006: Incentive Fee Decision letter from COL David Shutt to Mr. Fischer.

11. 2006 Incentive Fee Award Correspondence:

None

**PERTINENT CONTRACT PROVISIONS:**

12. Lease No. DACA85-5-88-17 Article IV, Rent.

13. Lease Exhibit C, Sec. H-4, Incentive Fee Board.

14. Lease Exhibit C, Sec. G-1, Refuse Collection.

15. Lease Exhibit C, Sec. C-1(h), Facility History Files.

16. Lease Exhibit C, Sec. D-5(a), Change of Occupancy Downtime.

17. Lease Exhibit C, Sec. E, Standards for Maintenance of Structures.

18. Lease Exhibit C, Sec. D-2, Contractor Quality Control.

**FINDINGS OF FACT:**

The lease allows for an incentive fee, for exceptional performance of standards contained in the lease annex, not to exceed five percent of the annual "Maintenance Rental" as determined annually by an Incentive Fee Board. The board will make a determination after the end of the period to grant all, some, or none of the incentive award fee.

**1995 Incentive Fee** - By letter dated January 10, 1996, the Army Department of Public Works (DPW) Incentive Fee Board awarded North Star $46,268.35 out of the maximum allowable amount of $56, 943.50 for the 1995 performance year. This resulted in awarding 4.16 percent of the maximum allowable of five percent. North Star has requested reimbursement of an additional $10,675.15 of incentive award totaling the full five percent allowable for exceptional performance for 1995. The incentive fee board determined that three and one third quarters of exceptional performance reflected a cooperative effort to mitigate excessive amounts of between occupancy downtime and North Star's efforts in maintenance, management, coordination and customer services. The board decided that North Star's unilateral notification to residents of their intention to provide central trash collection points and the actual elimination of curbside trash pickup services resulted in less than exceptional performance during the last two months of the year.

**1996 Incentive Fee** - By letter dated April 16, 1997, the Army Incentive Fee Board notified North Star that the 1996 incentive fee award was approved in the amount of $39,000.00, approximately 2/3 of the maximum allowable amount of $58,835.80. The incentive award was based on high ratings in customer service and North Star's overall responsiveness in accomplishing service orders and in the quality of work performed. The only rated areas which were significantly less than exceptional were between occupancy vacancy rates. North Star has requested an additional $19,835.80 of incentive award totaling $58,835.80, the full five percent allowable for exceptional performance for 1996.

**2002 Incentive Fee** - By letter dated February 20, 2003, the Army Incentive Fee Board notified North Star that no incentive fee was being awarded for the 2002 incentive fee year. Several issues were listed as detractors from the achievement of exceptional performance: The changing out locks with used locksets while charging the government for new ones, the manner in which the facility history files were kept to include missing documents, instances where two work authorizations were issued for the same work, the lack of a Quality Control Plan to assure accuracy of records, results of resident surveys, lacking of the general maintenance of the buildings including some siding beginning to buckle, paint peeling on garage doors and deteriorating countertops, flooring and appliances. Several letters were written back and forth between members of the Army Housing staff and North Star deliberating the issues listed in the Incentive Award notification letter of February 20, 2003. North Star has requested an incentive fee award of $65,326.59, totaling the full five percent allowable for exceptional performance for 2002.

**2003 Incentive Fee** - By letter dated March 9, 2004, The Army Incentive Fee Board notified North Star that no incentive fee was being awarded for the 2003 incentive fee year.

Several issues were listed as major barriers to an exceptional performance rating: A majority of the units received by the Government after change of occupancy maintenance had unacceptable deficiencies and had to be returned to North Star for corrective action; the same deficiencies found repeatedly in units indicating quality control shortcoming; exterior paint fading, peeling or discolored paint on many of the units; siding beginning to buckle and delaminating; porches deteriorating; paint on garage doors peeling; resident satisfaction surveys not being supportive of exceptional performance; janitorial services in Government office area lacking; complaints of condition of playgrounds, bike paths and common area maintenance. North Star has requested an incentive fee award of $66,701.88, totaling the full five percent allowable for exceptional performance for 2003.

**2004 Incentive Fee** - The Contracting Officer has been unsuccessful in obtaining a copy of the undated incentive fee notification letter to North Star signed by Mr. Lucht. It appears the letter would have been sent during the April/May 2005 time frame. In accordance with Mr. Wartes's dispute letter to Mr. Lucht, dated May 19, 2005, the Incentive Fee Board denied any incentive fee for the evaluation period of January 1, 2004 through December 31, 2004. In accordance with this letter, dated May 19, 2005 and Mr. Lucht's response letter, dated June 13, 2005, the issues for not awarding an incentive fee appear to be what the Government considered to be an unacceptably high number of units with discrepancies, inaccurate return dates given by North Star, general maintenance, resident survey results, janitorial services provided at Birchwood and condition of the playgrounds. North Star has requested an incentive fee award of $68,660.63, totaling the maximum of five percent allowable incentive fee award for exceptional performance for 2004.

**2005 Incentive Fee** - By letter dated June 20, 2006 COL David Shutt notified North Star that the Incentive Fee Board decided no incentive fee would be awarded for the evaluation period of 2005. The Government listed several issues and concerns that were considered in reaching their decision. The same deficiencies were found repeatedly in units after change of occupancy maintenance; only six percent of the units returned to the Government passed the first inspection and did not have to be redone. The Government felt the lack of an effective Quality Control Plan was costing both parties additional expenditures and resources. A resident survey was used to obtain customer feedback. North Star has requested an incentive fee award of $70,306.85, for exceptional performance during 2005.

**2006 Incentive Fee** - The Contracting Officer was unable to locate any evidence of an incentive fee decision by the Incentive Fee Board for 2006. North Star has requested an incentive fee award of $36,549.55, for exceptional performance during 2006.

**CONCLUSION:**

The Contracting Officer has thoroughly reviewed Federal Judge Francis M. Allegra's Opinion issued April 2, 2007. According to the Court's opinion, a host of factors led to the conclusion that the incentive fee decisions must be set aside as arbitrary and capricious. The Court held that the Incentive Fee Board relied upon factors that were not relevant to the established performance standards of the Lease. The Board denied incentive fees, in part, because North Star chose to dispute various interpretations of the Lease (e.g., depreciation and refuse collection) under the dispute resolution clause. The Army relied on resident surveys that were plainly envisioned and designed as a way of denying North Star incentive fees. Other issues used by the Incentive Fee Board in making a final decision that were considered

inappropriate by the Court are listed as depreciation issues, lockset issue that was resolved in 2000, rent deductions for change of occupancy downtime and failure to attend inspections.

After review of all pertinent correspondence and after disregarding any depreciation issues, resident surveys, janitorial service issues, failure to attend inspections and lockset issues; I conclude the following:

**1995 Incentive Fee** - I find that an annual incentive fee may be awarded for exceptional performance of standards contained in the lease. The only issue cited to be less than exceptional performance by North Star during this period was the unilateral notification to residents of North Star's intention to eliminate curbside trash collection service and the creation of a central trash collection point. The court found, in its April 2, 2007 Opinion, that it was inappropriate to deny incentive fees because North Star chose to dispute various interpretations of the Lease and the 1995 settlement agreement. I therefore find that North Star should receive a full 100 percent of the allowable incentive fee for 1995. I award an additional $10,675.00 to North Star for the 1995 incentive fee year.

**1996 Incentive Fee** - I find that an annual incentive fee may be awarded for exceptional performance of standards contained in the lease. Exhibit C, Sec. D-5(a) of the lease allows for three days of change of occupancy down time for each unit. Exhibit C, Sec. D-7(d)(1) of the lease requires all change of occupancy work to be completed within three working days after the unit becomes available, which shall be determined from the date the unit is turned over to the Developer by the Government for change of occupancy work. The Army notified North Star on July 10, 1996 during an Incentive Award Meeting that they would be issuing quarters in groups of eight so as to control the number of units issued within each five-day period. The court found in its April 2, 2007 Opinion, that stockpiling of units and issuing in groups was inappropriate and

caused a hardship on North Star. During the months prior to the July 10, 1996 meeting and prior to any stockpiling of units, the average change of occupancy turnaround time was between 10 and 12.5 days per unit. Even by interpreting these lease provisions to mean an aggregate of three days times the number of units issued in a month downtime averages of 10 – 12.5 days per unit for change of occupancy maintenance was excessive and would not be considered as exceptional performance. I find the incentive fee award of $39,000, approximately 2/3 of the maximum allowable amount of $58,835.80, to be fair and equitable. I find no further evidence that would warrant an additional incentive fee award for 1996.

**2002 - 2004 Incentive Fees** - I find evidence that there was at least some lack of quality control and maintenance of the exterior of the units in accordance with Exhibit C, Sec. E., Standards for Maintenance of Structures. The lack of maintenance of the exterior of the buildings, resulting in paint fading and peeling; siding buckling and delaminating; garage doors peeling and porches deteriorating, are examples of less than excellent performance of this Section of the lease. These same maintenance shortfalls continued to be mentioned by the Board from 2002 thru 2004. I therefore find that an annual incentive fee award of 75 percent of the maximum allowable is proper for each of the years 2002 thru 2004. I therefore award incentive fee amounts for the years 2002 thru 2004 as follows:

2002 - $48,994.94

2003 - $50,026.41

2004 - $51,495.47

**2005 Incentive Fee** - After careful review of the notice of incentive fee letter from COL Shutt to Mr. Wartes dated June 20, 2006, notwithstanding the issues decided by the court to be

arbitrary and capricious, I find no evidence of North Star's performance that would detract from a full incentive fee award for 2005. I therefore award the amount of $70,306.85 for 2005.

**2006 Incentive Fee** - There was no evidence found of any shortfalls on North Star's performance that would detract from a full incentive fee award for 2006. I therefore award the requested amount of $36,549.55 for 2006.

In regards to this COD concerning Incentive Fees, North Star is hereby awarded a sum total amount of $268,048.22 for the claims addressed in this COD. I further find that CDA interest should be paid on the principle amount of $268,048.22 from the date of receipt of this COD request (August 27, 2007) until paid. This decision in no way waives the United States' right to appeal the decision of the Court of Federal Claims in cases numbered 98-168C, 02-1632C and 03-2699 that determined entitlement to some of the claims decided in this document. My determination to pay North Star certain amounts in this document is predicated on the court's determination of entitlement and is subject to a final judgment in those cases. Should any appeal of the court's decisions be successful for the United States, then the quantum determinations contained in this decision will be null and void.

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or furnish written notice thereof to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041-3208, within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer, US Army Engineer District, Alaska, P.O Box 0898, Anchorage, Alaska 99506-0898, from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Armed

Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims within 12 months of the date you receive this decision.

The Small Claims Procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount of dispute, as a result of the final decision, is $50,000 or less; and the accelerated procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount in dispute, as a result of this decision is $100,000 or less.

Date: 7 Dec 07

Veronica A Hiriams
Veronica A Hiriams
Contracting Officer

# EXHIBIT D

REPLY TO ATTENTION OF:

**DEPARTMENT OF THE ARMY**
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-0898

CERTIFIED MAIL

MAR 1 2 2008

Office of Counsel

Ms. Rhonda Sekyra
North Star Alaska Housing Corporation
937 Harvard Avenue East
Seattle, WA 98102-4532

Re: Contracts DACA85-1-86-71 (Outlease), DACA85-9-86-27 (Agreement to Lease) and DACA85-5-88-17 (Lease), Fort Wainwright, Alaska

Dear Ms. Sekyra:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding the claim for Matching Surfaces (Feb 2002 through Nov 2004), Wall Repairs, Stove Replacements, Refrigerator Replacements, Carpet (Failure to Maintain), Depreciation, Cost Book Approval, Additional Payroll, Outstanding Overhead & Margin (1998 – May 2002), and Additional 40% Overhead on Fort Wainwright, Alaska.

If you have any questions about the enclosed COD, please contact Ms. Anne L. Burman of our Office of Counsel at (907) 753-2532.

Sincerely,

Veronica A. Hiriams

Veronica A. Hiriams
Chief, Real Estate Division
Contracting Officer

Enclosure

**FINDINGS OF FACT TO ACCOMPANY
CONTRACTING OFFICER'S DECISION**

**Matching Surfaces (Feb 2002 through Nov 2004)
Wall Repairs
Stove Replacements
Refrigerator Replacements
Carpet (Failure to Maintain)
Depreciation
Cost Book Approval
Additional Payroll
Outstanding Overhead & Margin (1998 - May 2000)
Additional 40% Overhead**

**CONTRACT NUMBERS:** DACA85-1-86-71 (Outlease)
DACA85-9-86-27 (Agreement to Lease)
DACA85-5-88-17 (Lease)

**NAME AND ADDRESS OF CONTRACTOR:** North Star Alaska Housing Corporation
937 Harvard Avenue East
Seattle, WA 98102-4532

**CONTRACT DESCRIPTION:**

To design and construct 400 family housing units for military personnel and their families on Fort Wainwright, Alaska, pursuant to the Military Construction Authorization Act of 1984, 10 U.S.C. § 2828(g), as amended by the Military Construction Authorization Act of 1986, Pub.L. No. 99-167, § 801.

The outlease is a lease of government property on Fort Wainwright to the developer, beginning on June 27, 1986, for a period of 32 years, subject to termination clauses.

The Agreement to Lease provided for the Government to lease back the property, including the 400 housing units and related structures and improvements, upon completion of the project.

The Lease between North Star Alaska Housing Corporation (hereinafter North Star) and the Government is for a period of 19 years and six months, beginning November 6, 1987.

**CONTRACT AMOUNT:**

The contract amount is determined to be the combined annual total of the shelter rent and the maintenance rent costs of the 400 units over the life of the Lease. That amount excludes Work Authorization repairs and utility charges, which are paid separately by the Government. Adjustments are allowed for fluctuations in the costs of maintenance and real estate taxes.

| **AMOUNT IN DISPUTE** | | |
|---|---|---|
| | $ 44,826.00 | – Matching Surfaces, plus additional 40% O/H |
| | $ 43,513.00 | – Wall Repairs plus additional 40% O/H |
| | $ 81,221.00 | – Stove Replacements plus additional 40% O/H |
| | $ 2,500.00 | – Refrigerator Replacements, No O/H or profit included |
| | $ 94,525.00 | – Carpet, Failure to Maintain plus additional 40% O/H |
| | $ 578,112.00 | – Depreciation (includes 50% O/H) |
| | $ 17,359.00 | – Cost Book, Lack of Approval (includes 50% O/H) |
| | $ 458,078.00 | – Additional Payroll (includes 50% O/H) |
| | $ 26,917.00 | – Outstanding Overhead & Margin 1998 to May 00 |
| | $1,347,051.00 | – Sub Total |
| | $ 1,969.00 | – Additional Overhead (Approx. 40%) for Contracting Officer's Decision (COD) dated October 25, 2007 |
| | $ 105,634.00 | – Additional Overhead (Approx. 40%) for selected items, this COD |
| | $1,454,654.00 | – Total |

**THE DISPUTE:**

North Star requests payment from the Government of $1,887,822.04 consisting of seven major claim areas Parts (A – G) as shown in their claim dated August 23, 2007. North Star also requests Contract Disputes Act (CDA) interest from the date of submission of the claim. The total sum claimed of $1,887,822.04 includes an additional 40% overhead requested for Part B and Parts D-F of the claim. A partial decision was issued on October 25, 2007 addressing Parts A, B-2 thru B-6, B-12 and B-13, however the request for 40% additional overhead was not decided in the October 25, 2007, decision. Another partial decision was issued on December 7, 2007, addressing Part C, Incentive Fees. This final decision pertains only to the following parts of the claim:

**Part B-1, Matching** for which North Star alleges the Government improperly required matching of items which were adjacent to replaced items, such as carpeting and countertops.

**Part B-8, Wall Repairs** for which North Star contends that prior to 2002, the Government required the tenants to perform wall repairs and spackling at each change of

occupancy. Beginning in March 2002 the Government no longer required the tenant to perform spackling if the unit was scheduled to receive a full interior painting.

**Part B-9, Stoves** for which North Star states that from 1999 through 2006, 179 stoves were replaced at Birchwood Estates by North Star. One stove was replaced due to fire damage and the cost was reimbursed by the Government. North Star's site manager contends that all other stoves were replaced because of significant scratches, burns or chips, not because of unit failure.

**Part B-10, Refrigerators** for which North Star estimates they have replaced approximately 50 refrigerators between 1997 and 2002. North Star further contends that 10% (five each) of the refrigerators should have been work authorized due to damages caused by the tenants beyond normal wear and tear.

**Part B-11, Carpet (failure to maintain)** for which North Star estimates that full carpet replacements were completed in 80 housing units due to fair wear and tear (FWT) from 1997 until August of 2002. North Star further estimates that 75% of the carpet replacement was due to lack of care and not following the carpet maintenance instructions as provided to the Government.

**Part D, Depreciation** for which in accordance with the Opinion of the United States Court of Federal Claims in North Star Alaska Housing Corporation v. The United States, Nos. 98-168C, 02-1632C and 03-2699C, filed April 2, 2007; North Star is entitled to reimbursement for any costs not previously paid to North Star because of the replacement items being depreciated by the Government. North Star contends that all North Star costs billed to the Government between January 2001 and March 2007, not previously paid by the Government, fall into the category of "depreciation" and should be reimbursed to North Star.

**Part E, Cost Book Approval** for which North Star contends the Government unilaterally altered the process for preparing work authorizations and improperly removed items from the List of Repair Costs. North Star further contends that the practice of delaying the approval of the List of Repair Costs (Cost Book) damaged North Star resulting in under-billing between Fiscal Year (FY) 2003 and FY 2006.

**Part F, Additional Payroll** for which North Star contends they have incurred additional payroll costs due to additional accounting and scheduling burdens caused by the Government's stockpiling of units for same day release, failure to provide adequate notice of inspections, failure to provide work authorizations, failure to provide additional time for extensive repair work and improper use of extra-contractual inspections.

**Part G, Overhead & Margin 1998 to May 2000** for which North Star contends the Government improperly withheld 10% overhead from 1998 thru May 2000.

**Additional 40% Overhead for items: B, D, E & F** for which North Star contends their actual overhead costs to be 50% rather than the 10% that was previously requested and justified.

**PERTINENT CORRESPONDENCE:**

1. Reserved.
2. Letter from North Star (Rhonda Sekyra) to the Contracting Officer (Veronica Hiriams), dated March 4, 2008.
3. Defense Contract Audit Agency (DCAA) Audit Report No. 4201-2008C17200001, dated February 28, 2008.
4. Letter from North Star (Rhonda Sekyra) to DCAA (Nancy Machida), dated February 21, 2008.
5. Overhead Comparables Spreadsheet, obtained January - February 2008.

6. Partial COD, dated October 25, 2007 in Response to North Star's Request for COD, dated August 23, 2007.
7. CDA Claim; Request for COD, dated August 23, 2007.
8. Opinion of the United States Court of Federal Claims (COFC) in North Star Alaska Housing Corporation v. The United States, Nos. 98-168C, 02-1632C and 03-2699C, filed April 2, 2007.
9. Letter from Contracting Officer to Mr. Eldon Wartes accepting 10% Overhead Rate Request, dated February 27, 2003.
10. COD: Profit and Overhead, dated September 9, 1998.
11. North Star's Proposal No. FW0019003, page 27: "Plans for Repair or Replacement of Major Components," to the Government's Request for Proposal No. DACA85-85-R-0019, 1985.
12. Chugach Support Services, Inc. (CSSI) faxed attachment No. 1, Estimated Replacement Cost of Appliances and Life Expectancy.
13. Bank of America, Home buying, Loans, and Lines of Credit, Life Expectancy of Home Appliances, Website.
14. Army Regulation (AR) 420-1, Maintenance and Repair Furnishings, pages 105 - 106.

**PERTINENT CONTRACT PROVISIONS:**

15. Lease No. DACA85-5-88-17 Exhibit C, Maintenance, Repair and Operational Services Standards Annex.

**FINDINGS OF FACT:**

**Claim B-1: Matching** -- North Star requests reimbursement of $44,826.00 (plus additional 40% overhead) for flooring and counter tops estimated to have been replaced for the

purpose of matching adjacent replacement items for the period of February 2002 through November 2004. On page 85 of the Court's Opinion filed April 2, 2007, North Star is entitled to recover the costs associated with the matching of adjacent replacement items. North Star took random samples from the months of August 2002, October 2003 and September 2004 to establish its estimate that 80% of its billings addressed floorings and countertops. North Star calculated their estimated costs by applying a 5% factor to the 80% estimate. The 5% factor was North Star's estimate of the percentage of the cost billed for flooring and countertop replacements for which the Government denied payment because the replacements did not match adjacent flooring and countertops. North Star then added $16,451.00 derived by applying total unpaid billings between December 2004 and March 2007 to the ratio between the matching cost (combined with smaller dollar specifically identified as unpaid billing amounts) and unpaid North Star billings between February 2002 and November 2004. Ten percent overhead and 10% profit are included in the claimed cost of $44,826.00.

**Claim B-8: Wall Repairs** – North Star requests reimbursement of $43,513.00 (plus additional 40% overhead) for performance of spackling and wall repairs from 2002 through 2007. Ten percent overhead and 10% profit are included in the claimed cost of $43,513.00. North Star developed the claimed cost by applying an annual rate for spackling wall repair against the number of full interior paint jobs performed between March 2002 and March 2007. North Star contends that prior to FY 2002, the Government required tenants to perform this task and beginning in FY 2002, the Government required North Star to assume this task as part of "paint prep" for interior paints and refused payments on any wall repair billings. According to a Memorandum dated March 11, 2002, signed by Ms. Connie Kiser, the occupants were to

continue to pull all nails, but if the unit was scheduled for a full interior painting, they did not have to spackle unless it was determined to be an excess amount (approximately one hour).

Beginning in March 2002, the Government considered spackling to be a part of the preparatory work associated with a full painting.

**Claim B-9: Stove Replacements** – North Star requests reimbursement of $81,221.00 (plus additional 40% overhead) for 178 stove replacements. Ten percent overhead and 10% profit are included in the claimed cost of $81,221.00. North Star claims the cost not paid by the Government to replace stoves between FY 1999 and FY 2006 were due to damage by the occupant's lack of attention to maintenance instructions provided to the Government by North Star. None of these stove replacements were previously billed to the Government. North Star stated that the reason no billings were previously submitted to the Government is North Star's belief the Government would not have work authorized. During the DCAA audit process, North Star's stove count by year was compared to notations on its general ledger correlating purchases with specific invoices and no material differences were found. Selected vendor invoices were traced and verified the reasonableness of North Star's count and cost per stove. The bulk of the stove replacements occurred after the 15th year of the lease.

**Claim B-10: Refrigerator Replacements** – North Star requests reimbursement of $2,500.00 (plus additional 40% overhead) for an estimated five refrigerator replacements at an average cost of $500.00 per unit. North Star estimates that 50 refrigerators were replaced between 1997 and 2002. North Star further estimates that 10% of the 50 refrigerators replaced were due to occupant damages beyond normal wear and tear and should have been work authorized by the Government. It was revealed through the DCAA Audit Report that North Star

had not applied the original approved 10% overhead or 10% profit to develop the claimed cost of $2,500.00.

**Claim B-11: Carpet (failure to maintain)** – North Star requests reimbursement of $94,525.00 (plus additional 40% overhead) for reimbursement of carpet for which North Star believes was purportedly deemed FWT by the Government, but was actually the result of the Government's failure to repair occupant damage that in later years appeared to be FWT. On page 63 of Judge Allegra's Opinion filed April 2, 2007, it was found that the Government adopted the practice of failing to correct occupant damage so that it would be viewed, upon the next tenant changeover, as normal wear and tear. The period of time claimed for this issue is from 1997 until August 2002. North Star contends that 75% of the carpet replaced as FWT during this time period was replaced due to a lack of care by the occupant and not following the maintenance instructions as provided to the Government. North Star estimates 80 units required carpet replacement between June 1997 and August 2002. North Star further estimates that 75% of the 80 replacements were replaced due to the Government's lack of proper care of the carpet and contends the Government should reimburse them for their estimated replacement costs.

**Claim D: Depreciation** – North Star requests reimbursement of $578,112.00 (includes 50% overhead) for unpaid billings between January 2001 and March 2007 which North Star contends the Government denied reimbursement based on depreciation and apportionment. Beginning in July 1997, as described on pages 60 and 62 of the Federal Court Opinion filed April 2, 2007, the Government unilaterally implemented a ten-year depreciation schedule to adjust reimbursements for carpet damages due to occupant negligence to reflect the remaining useful life of the carpet. The depreciation schedule and apportionment allocation was extended to billings for vinyl flooring, counter tops and other items. The claimed costs for depreciation

are reduced by amounts claimed under "Matching" (B-1). DCAA performed an audit testing 77 transactions of 21 separate housing units. Upon comparing the documentation in the unit files against the billing records, the auditor noted that North Star categorized all disapproved costs as "depreciation," regardless of the documented reason for disapproval. For instance, although the Army Housing Manager disapproved a portion of billed cost as "not in accordance with approved cost list" and the rest of the billed cost was disapproved as "FWT" item, North Star did not make any distinction between the reasons but considered all "depreciation."

In addition, it was noted that the billings included re-billings of the same work in some of the units tested. Because North Star computed "depreciation" essentially as the difference between billed and approved costs and because North Star did not cull out these re-billings, an initial disapproved billing amount as well as any unpaid amount in the rebilling of the same cost were both included in the claim resulting in doubling up of claimed costs.

**Claim E: Cost Book** – North Star requests reimbursement of $17,359.00 (includes additional 40% overhead) for delays in the Government's approval of the annual Cost Book and requiring North Star to bill at the old Cost Book rate until the new rates were approved. North Star contends that there were six month delays in approving the price books resulting in North Star under-billing for the first six months of the year. They calculated the claimed total under-billing by applying an average invoice cost percentage increase by year to the sum of billed cost for the first six months of each year between FY 2003 and FY 2006. There was no indication that North Star re-billed the costs after receiving the new Cost Book.

**Claim F: Additional Payroll** – North Star requests reimbursement of $458,078.00 (includes 50% overhead) for additional payroll cost beyond normal market salary adjustments as a consequence of the additional accounting and scheduling burdens caused by the Government's

"bad faith" practices of stockpiling, failure to provide work authorizations, failure to provide extra time for extensive repairs, and improper use of extra-contractual inspections. North Star further claims they incurred the additional payroll for these reasons beginning in FY 2002 through the first quarter of FY 2007. North Star calculated the claimed cost by applying 50% overhead and 10% profit to the sum of payroll "excess." Pages 15 through 18 of the DCAA audit report explains in detail the process used by North Star to complete their calculations and the auditor's rational for questioning some of North Star's calculations. DCAA questioned $214,229.00 of the $458,078.00 that North Star claims as additional payroll. Questioned costs do not include associated profit in the amount of $21,423.00.

**Claim G: Unpaid Overhead and Margin** – North Star requests reimbursement of $26,917.00 for unpaid overhead between January 1998 and May 2000. North Star contends that the Government withheld 10% overhead and margin during the years 1998 through May 2000. DCAA was able to substantiate that the Government withheld 10% overhead from 1998 through May 2000. On February 27, 2003, the Contracting Officer approved a ten percent overhead rate as acceptable and included a calculation of unpaid ten percent overhead on billings back to June 2000. This claim is for the 10% overhead withheld between 1998 and May 2000.

**Additional 40% Overhead** – North Star requests an additional 40% overhead for their claim in items B, D, E and F. North Star was approved to charge the Government a 10% overhead rate and a 10% profit margin by letter dated February 27, 2003. In accordance with Exhibit C to Lease No. DACA85-5-88-17, Part C-1 (t), List of Repair Costs: "The man-hour requirements will be multiplied by the Department of Labor Service Contract Act Wage Determination rate plus materials at wholesale cost plus reasonable overhead and profit." Research of overhead rates from six other facilities maintenance contractors revealed comparable

overhead rates ranging from 10% to 30%. Three of the contractors charged one at 10%, one at 15%, one at 23.34% and one at 30%. Three of these contractors were from the Alaska area and three were from New York 801 Housing lessors.

DCAA has determined through their audit that North Star's actual overhead rate has been running 50%. The reason for the comparably high overhead rate has not been determined. North Star is requesting to recover their actual overhead rate. In North Star's claim, all Section "B" items, except Item B-10: Refrigerators reflect an error in the calculations for the 40% additional overhead. The 40% is taken on top of the sum of the original 10% previously approved overhead and the 10% profit. Item B-10: Refrigerators appears to not reflect either overhead or profit in the claimed amount. Items D: Depreciation, E: Cost Book and F: Additional Payroll, all reflect sums that already include the total of 50% overhead and 10% profit.

Overhead for all items in Part B have been recalculated to reflect a 50% overhead plus 10% profit. The original 10% overhead and 10% profit were backed out, then 50% overhead calculated on the base cost then 10% profit margin added.

**CONCLUSION:**

**Claim B-1: Matching** – In regards to the matching claim for $44,826.00 (plus additional 40% overhead), this claim is based strictly on estimates of flooring and counter top replacements that were required for the purpose to match kind and color of adjacent replaced items and not work authorized for payment by the Government. North Star's methodology of extrapolating and estimating the amount of flooring and counter tops that were replaced for the purpose of matching adjacent replaced items lacks some validity. However, since North Star deducted the entire claimed cost of $44,826.00 from the pool of unpaid billings before computing the claimed

costs for Item D "depreciation," the Contracting Officer is willing to accept that this separate claim would have otherwise been submitted as part of claimed Item D "depreciation."

A review of all billings from North Star and work authorizations by the Government from October 2003 through March 2007, were reviewed and no "matching" issues were found. I therefore find that the added cost by North Star of $16,451.0000 for matching during the period of December 2004 and March 2007 to be invalid. In this regard, I find that North Star should be reimbursed the difference between $44,826.00 and the invalidated $16,451.00 for a sum of $28,375.00 plus an additional 40% overhead, totaling $36,986.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007)'.

**Claim B-8: Wall Repairs** – In regards to wall repairs and spackling claim for $43,513.00 (plus additional 40% overhead) from 2002 through end of lease in May 2007, a memorandum signed by Ms. Connie Kiser, dated March 11, 2002, gave instruction that tenants were not required to perform spackle unless more than one hour was required to complete the task. This policy applied to units scheduled for full interior paintings. Full interior paintings as scheduled by the lease were verified as being completed. I find it reasonable that one to two hours of labor would be required to spackle holes in walls of which the tenants were previously required to perform. I, therefore, find that North Star should be reimbursed $43,513.00, plus an additional 40% overhead, totaling $56,719.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Claim B-9: Stoves** – In regards to 178 stove replacements, it has been verified that multiple stove purchases were invoiced to North Star and tied to work order request logs. The number of stoves purchased was tied to work orders for stove installations within a reasonable period of the actual purchase. Even though there is substantial evidence that as many as 178

stoves were replaced between FY 1999 and FY 2006, there is not sufficient evidence that the cause of stove replacements were due to occupant damages beyond normal wear and tear. In accordance with AR 420-1, the normal useful life expectancies of household appliances for non-tropical areas range from seven to 15 years. The Bank of America Home Equity Web site lists the life expectancy of some home components including appliances. Gas ranges have the longest life expectancy of 15 years. Refrigerators are listed as about 13 years. CSSI, contractor for Army Housing at Ft. Richardson, AK, estimates appliance replacement for stoves to be 10 years and refrigerators to be 15 years.

Although not included in the final lease between North Star and the Government, North Star's response, No. FW0019003 to the Government's Request for Proposal No. DACA85-85-R-0019 included "Plans for Repair or Replacement of Major Components" on page 27. This "Plans for Repair or Replacement of Major Components" document listed both stoves and refrigerators with an expected life of 10 years, to be replaced as needed but at least once during the initial 20 year term of the lease. This is an indication of North Star's expectation of the normal useful life of these appliances when used in rental properties. These replacement time schedules are in line with normal industry standards as evidenced in the above paragraph.

It appears reasonable that a significant number of stoves would require replacement by 2003 or after approximately 15 years of scratches, burns and chips through normal wear and tear. It also appears reasonable to the Contracting Officer that a number of stoves intermittently replaced in 1999, 2000 and 2002, could have been replaced before their normal life expectancy of 12 to 15 years in accordance with industry standards, equating to 13 units. It is conceivable that these 13 units may have been replaced due to occupant damages beyond normal wear and tear. Without any evidentiary support contrary to the norm, it is impossible, at this late date, to

determine that 178 stoves had to be replaced due to occupant damages beyond normal wear and tear. In this regard, I find that North Star should be reimbursed $5,161.00 as claimed for four stoves in 1999, six stoves in 2000, and three stoves in 2002, plus an additional 40% overhead, totaling $6,727.00, plus CDA interest from August 27, 2007.

**Claim B-10: Refrigerators** – In regards to the request for replacement of five refrigerators for a total of $2,500.00 (plus an additional 40% overhead), it has been verified by North Star's general ledger that approximately 500 refrigerators were purchased between FY 2000 and FY 2002. Due to the low materiality and the reasonableness of approximately 10% of the replacements being attributed to occupant damages above normal wear and tear, I find that North Star should be reimbursed $2,500.00 plus 50% overhead and 10% profit, totaling $4,125.00, plus CDA interest from August 27, 2007, for the replacement of five refrigerators between 1997 and 2002. The DCAA audit revealed that North Star had not applied overhead or profit to develop the claimed cost of $2,500.00.

**Claim B-11: Carpet (Failure to Maintain)** – In regards to North Star's claim for reimbursement of $94,525.00 (plus additional 40% overhead) North Star claims that 75% of 80 carpet FWT replacements between June 1997 and August 2002 were the result of the purported Government's failure to repair occupant damage that in later years appeared to be FWT. There are no billings to the Government or noted evidence to substantiate the claim that 75% of 80 carpet FWT replacements between June 1997 and August 2002 were replaced due to the Government's "lack of care" rather than FWT. It is the Contracting Officer's opinion that North Star has not provided sufficient evidence to support this portion of their claim.

**Claim D: Depreciation** – In regards to North Star's claim for reimbursement of $578,112.00 (including 50% overhead) for unpaid billings between January 2001 and March

2007 that were denied based on "depreciation," there are discrepancies in the claimed data. DCAA audited 77 transactions involving 21 separate housing units included in this portion of North Star's claim. Upon comparing the documentation in the unit files against the billing records, the auditor noted that North Star categorized all disapproved costs as "depreciation," regardless of the documented reason for disapproval. The 77 transactions tested involved a total dollar amount of $107,194.00. Of the $107,194.00, an amount of $72,994.00 was questioned as suspect. Because North Star computed "depreciation" essentially as the difference between billed and approved costs, and because North Star did not cull out any re-billings, the initial disapproved billing amounts as well as any unpaid amount in the rebilling of the same cost were both included in the claim resulting in doubling up of claimed cost.

As noted in the DCAA Audit Report, these discrepancies cast doubt on the reliability of the billing records. In accordance with the results summary shown on page 13 of the DCAA Audit Report, the questioned costs of the $76,567.00, before additional 40% overhead, were $52,139.00 as follows:

| | |
|---|---|
| Apportionment - | $ 7,234.00 |
| FWT - | $34,285.00 |
| Not necessary - | $ 798.00 |
| Duplicate-rebilling - | $ 8,886.00 |
| No reason - | $ 234.00 |
| Not billed in acc/cost book - | $ 702.00 |

Based on pages 60 and 61 of the Federal Court's Opinion filed April 2, 2007, "apportionment" is considered in the same light as "depreciation." In accordance with page 63 of the same Opinion,

the Government had a practice of failing to correct occupant damage and later classifying it as fair wear and tear.

In review of the 77 transactions tested by DCAA, the Contracting Officer found that all partial approvals for flooring and countertops were placed into the categories of either "depreciation" or "apportionment." Several requests for payment of flooring were disapproved by the Government and listed as FWT. Of the work authorizations that listed FWT as the reason for disapproval some had notations that there was no need to seal the floors and no detection of urine odor or stains. Other work authorizations listing FWT as the reason for disapproval of carpet reflected approvals for the reimbursement costs for sealing only. It has been determined that the only reason for the sealing of floors during change of occupancy maintenance is the detection of urine. As a result of this finding and in light of the Federal Court's Opinion, the Contracting Officer is willing to give the benefit of the doubt to North Star where the disapproval for reimbursements of flooring and countertop replacements were listed as FWT. By allowing North Star to include the previously questioned costs of "apportionment" and "FWT" into their "depreciation" billings, this results in 86% or $65,947.00 of the tested $76,567.00 to be substantiated. I, therefore, find that North Star should be reimbursed $497,176.00 (86% of $578,112.00) plus CDA interest from the date of receipt of this COD request (August 27, 2007). The amount of $497,176.00 includes North Star's request for an overhead rate of 50% on the approved reimbursement.

**Claim E: Cost Book** – In regards to North Star's claim for reimbursement of $17,359.00 (includes additional 40% overhead) due to delay of Cost Book approval, North Star was required to bill cost during a new year using prices from the prior year's Cost Book. North Star has calculated the claimed total under-billing by applying an average invoice cost percentage

increase by year to the sum of billed costs for the first six months of each year between FY 2003 and FY 2006. The approval delay for the Cost Books has been verified to be near six months. There appears to be no re-billing at the new approved Cost Book prices after receiving the approval of the new Cost Books. I therefore find that North Star should be reimbursed $17,359.00, which includes an additional 40% overhead, plus CDA interest from the date of receipt of this COD (August 27, 2007).

**Claim F: Additional Payroll** – North Star requested reimbursement of $458,078.00 (includes 50% overhead), claimed as additional payroll costs beyond normal market salary adjustments as a consequence of the additional accounting and scheduling burdens caused by the Government's practices of stockpiling, failure to provide work authorizations, failure to provide extra time for extensive repairs, and improper use of extra-contractual inspections. Pages 51 through 57 of the Federal Court's Opinion filed April 2, 2007, indicate that some of the Government's actions listed above clearly made it more difficult for North Star to perform their contract and increased their costs. These costs, however, should not be duplicated within the claimed issues or overlapped in compensation awarded to North Star.

Pages 15 through 18 of the DCAA Report discussed in detail the audited process and findings. DCAA questions $214,229.00 of the $458,078.00 claimed, not including the associated 10% profit on the $214, 229.00. By including the 10% profit associated with the $214, 229.00, the actual questioned amount is $235,652.00 of the $458,078.00 claimed amount. DCAA determined that the 50% overhead rate is the actual rate and an acceptable rate. DCAA adjusted North Star's calculation to remove all overhead employee salaries and burdens from the computations because any increase in the overhead salaries and burden for the site manager and administrative employees is recouped through applying the 50% overhead rate. DCAA was not

convinced that increases in health insurance premiums, payroll processing fees and pension plan fees were related to the Government's "bad faith" practices and therefore questioned those costs. In regards to the number of hours worked from FY 2000 through FY 2006, DCAA noted that as a general trend, hours worked decreased as salaries and wages increased.

They recomputed the annual increases to apply to the standard year using the average annual increases for salaried direct employees presented by North Star. They then selectively tested the list of salaried employees provided by North Star against W-2 information and found no material differences. Based on these procedures, DCAA then recalculated the excess attributable to increases in direct employee wages and payroll taxes and after applying the 50% overhead expense and ten percent profit, they questioned the difference from the claimed amount. The questioned costs do not include associated profit in the amount of $21,423.00.

After receiving North Star's response, the DCAA auditor believes that North Star's demonstration is based on the same conceptual error reflected in its original calculation of claimed additional payroll. In its demonstration, North Star calculates additional payroll costs based on the sum of direct and indirect hours. A duplication of indirect costs then would occur when North Star applies the overhead rate to these commingled costs. DCAA believes their calculation eliminates this duplication by purifying additional payroll costs to contain only direct costs. This allows North Star to recoup the increase for indirect employee costs through the application of the 50% overhead rate (which already includes salary costs for indirect employees) to the additional direct payroll costs.

I agree with the methodology used by the DCAA auditor in their determination that would allow North Star to recoup the increase for indirect employee costs through the application of the 50% overhead rate to the additional direct payroll costs. I, therefore, find that

North Star should be reimbursed $222,426.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007). The $222,426.00 is calculated by subtracting the questioned amount of $214,229.00 plus the associated 10% profit margin of $21,423.00 from the claimed amount of $458,078.00 (includes 50% overhead).

**Claim G: Unpaid Overhead and Margin** – In regards to the claim for 10% overhead rate for the period of 1998 through May 2000, it was determined by a Contracting Officer's Decision letter, dated September 9, 1998, that no overhead would be paid until North Star submitted financial information supporting its claim for a 10% rate. By Contracting Officer's letter dated February 27, 2003, a 10% overhead rate was approved and calculations provided dating back to June 2000. There was no evidence found reflecting reimbursement to North Star of the 10% overhead for the period of February 1998 through May 2000. I, therefore, find that North Star should be reimbursed $26,917.00, plus CDA interest from the date of receipt of this COD request (August 27, 2007).

**Additional 40% Overhead for Parts B-2 thru B-6** – In regards to the additional overhead that was not addressed in the Contracting Officer's Decision dated October 25, 2007, I find that North Star should be reimbursed an additional 40% overhead amount of $1,969.00 on the following items that already include 10% overhead and 10% profit margin:

B-2: Matching Carpet unit 884 - $1,674.00

B-3: Carpet & Vinyl Unit 833 - $3,478.00

B-4: Gutter Downspout Unit 638 - $40.00

B-5: Carpet & Counter Unit 961 - $1,115.00

B-6: Repainting Bathroom Unit 961 - $179.00

Total = $6,486.00; additional 40% overhead = $1,969.00

In regards to this final COD, North Star is hereby awarded a sum total amount of $870,404.00 for the claims addressed in this COD which includes additional 40% overhead for approved items awarded in the COD, dated October 25, 2007. I further find that COD interest should be paid on the principle amount of $870,404.00 from the date of receipt of this COD request (August 27, 2007) until paid. This decision in no way waives the United States' right to appeal the decision of the COFC in case Nos. 98-168C, 02-1632C and 03-2699C that determined entitlement to some of the claims decided in this document. My determination to pay North Star certain amounts in this document is predicated on the court's determination of entitlement and is subject to a final judgment in those cases. Should any appeal of the court's decisions be successful for the United States, then the quantum determinations contained in this decision will be null and void.

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals. If you decide to make such an appeal, you must mail or furnish written notice thereof to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041-3208, within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer, US Army Engineer District, Alaska, P.O Box 0898, Anchorage, Alaska 99506-0898, from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims within 12 months of the date you receive this decision.

The Small Claims Procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount of dispute, as a result

of the final decision, is $50,000 or less; and the accelerated procedure of the Armed Services Board of Contract Appeals shall be applicable, at the sole discretion of the Contractor, in the event the amount in dispute, as a result of this decision is $100,000 or less.

Date: 12 March 2008

Veronica A. Hiriams

Veronica A Hiriams
Contracting Officer

# EXHIBIT E

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone: 907.356.1616
Facsimile: 907.356.1675
nsah@acsalaska.net

937 Harvard Avenue East
Seattle, Washington 98102
Telephone: 206.328.2000
Facsimile: 206.328.4000
fischerprop@fischerproperties.com

April 29, 2008

Veronica A. Hiriams
Chief, Real Estate Division
Contracting Officer
Department of the Army
U.S. Army Engineer District, Alaska
P.O. Box 6898
Elmendorf AFB, Alaska 99506-0898

Re: Contracts DACA85-1-86-71 (Outlease), DACA85-9-86-27 (Agreement toLease), Fort Wainwright, Alaska. March 12, 2008 Contracting Officer's Decision Regarding Matching, Wall Repairs, Stove Replacements, Refrigerator Replacements, Carpet, Depreciation, Cost Book Approval, Additional Payroll, Outstanding Overhead & Margin and Additional 40% Overhead; Omitted Costs Incurred

Dear Ms. Hiriams:

Your decision of March 12, 2008 awarded North Star a sum total amount of $870,404.00 plus interest from August 27, 2007 forward for the claims addressed in that COD. As of this date, which is more than 30 days after the receipt of our invoice for this amount, the Government has paid only $88,687.56, plus interest, of the awarded amount and notwithstanding our requests, has not indicated when the full amount will be paid. As stated previously, this amount is required to be paid promptly. Again, we respectfully request your assistance in securing payment of all of the awarded damages as required pursuant to FAR 1.602-2.

## I. REEXAMINATION OF DAMAGES NOT AWARDED

We have reviewed the information given the auditor and believe some of the evidence which was provided may not have been provided to you or was overlooked in your decision. Specific reasons for reexamination of the damages not awarded are discussed below with respect to stoves, carpet, additional payroll, and incentive fees.

### A. STOVES

On page 7 of your decision, you note that during the "DCAA audit process, North Star's stove count by year was compared to notations on its general ledger correlating purchase with specific invoices and no material differences were found. Selected vendor invoices were traced and verified the reasonableness of North Star's count and cost per stove." In your entitlement conclusion for the B-9: Stoves, however, you arbitrarily determine a "normal life expectancy.... in accordance with industry standards," and improperly rely

North Star Alaska Housing Corporation

FISCHER PROPERTIES

on a North Star RFP response that you admit is of no contractual significance. In fact, at best, the statement you rely upon predicted only that stoves would be replaced within the first 20 years of the lease. Here, as you acknowledge, the stoves at issue were replaced within the first 15 years of the lease. You further state that "without evidentiary support contrary to the norm, it is impossible, at this late date, to determine that 178 stoves had to be replaced due to occupant damages beyond normal wear and tear."

Your conclusions overlook the substantial evidence supporting the reasons for replacement provided to the auditor. This evidence clearly demonstrated that none of the stoves were replaced because they failed or because of normal wear and tear; rather the documentation clearly showed that the stoves were replaced because of occupant damage. The Government provides no evidence to the contrary. In addition, please see the enclosed unit documentation for several randomly selected stove replacements in each year from 2003 through 2006 showing stoves were never replaced due to unit failure and only replaced because of significant scratches, burns, chips or other occupant damaged parts. The enclosed records reflect damages occurring from occupants using improper cleaners causing damage to elements, the stove top, controls and control covers (some replacement parts discontinued), often leaving control information unreadable. These records further reflect other significant accumulated damage including tenant improper re-wiring, damaged seals, broken or missing parts and fire damage (in addition to unit 620).

Further, the reasons for replacement in 2003 through 2006 are no different than in prior years, rendering the age of the unit as a reason for replacement irrelevant. Your conclusion of denying North Star reimbursement for replacements (based on age as discussed above) from 2003 through 2006 (the period when the number of replacement jumps significantly higher) imposes a depreciation schedule of the type that the court has already determined to be without contractual basis. In light of the substantial evidence North Star has presented and the fact that these replacements occurred during the period in which the judge found the Government to be acting in bad faith, we request that you reconsider your finding regarding this claim and provide full reimbursement to North Star in the additional amount of $102,239.84 after applying the additional 40% overhead. Further, we should note here that the calculation in your decision appears to be in error. The cost of $5,161 that you calculate for stoves from 1999 to 2002 does not include 10% overhead or 10% margin, therefore, with 50% overhead and 10% margin, the correct amount for that period should be $8,516, not the of $6,727 award in your decision.

**B. CARPET**

In your findings of fact and conclusion for the damage regarding claim B-11: Carpet (failure to maintain), you repeat a description of the original estimated claim calculation and fail to mention or fail to take into account the fact that an actual damage calculation was provided during the audit and tested by the auditor that more than supports our claim. The auditor was provided with cost per yard evidence as well as all unit documentation regarding carpet

damage for multiple units showing the reason (clearly occupant damage due to lack of care and, not fair wear and tear (FWT)) for replacement which agreed to the actual carpet damages listing and also showed tested yards replaced at North Star's cost for all of the years claimed. As stated in our February 27, 2008 letter to the auditor, which we specifically requested to be included in the audit report submitted to the Army, the actual damages calculated are an additional $28,476 over the originally claimed amount, for damages of $123,001 before applying the additional 40% overhead.

The evidence we provided does not support your conclusion that "North Star has not provided sufficient evidence to support this portion of their claim." In fact, North Star has not only provided sufficient evidence to support the originally claimed amount but has also provided substantial evidence that we suffered damages significantly in excess of the originally claimed amount. In addition, by stating that the carpet was replaced because of FWT, your decision effectively ignores the court's express finding regarding the Government's bad faith " . . . practice of failing to correct occupant damage so that it would be viewed, upon the next tenant changeover, as normal wear and tear." In light of the above, we request that you reexamine your denial of the B-11 carpet claim and award $123,001, totaling $167,728.64 after applying the additional 40% overhead.

**C. PAYROLL**

We respectfully believe that the auditor's analysis of the increased payroll (and therefore your decision) was in error for at least the following reasons:

1. Even though the auditor had the actual payroll records and costs for the increased direct labor, by employee, for the relevant periods she did not use those actual costs. Instead, she used an "estimate of overhead". In point of fact, had she used the actual payroll records she would have determined that just the salary portion was $223,851 (see attachment A). Attachment A is a summary using the actual payroll records for the years 1999 through Quarter 1, 2007 which, again, shows an actual direct cost of $223,851 without any markups for burden or overhead.

2. Another error was to exclude burden even though the burden was an actual cost incurred by North Star. Attachment A also contains a calculation of the actual burden with deductions made for insurance increases and pension plan as stipulated by the auditor. The burden including payroll tax is $33,504. Adding the $33,504 to the additional salary of $223,851 brings a total without overhead and margin of $257,355.

Applying a 50% overhead factor to the direct costs of $257,355 and a 10% margin thereafter results in the total damage award amount due of $424,636. Again, this is based on actual payroll records using the auditor's method of calculation and adding appropriate burden thereto.

As a result the additional amount due is $202,310 ($424,636 - $222,426).

**D. INCENTIVE FEES**

With regard to Incentive Fees, your decision of December 7, 2007 failed to provide an incentive fees award for all of 2006 and for a partial year in 2007. North Star is entitled to incentive fees for all of 2006 and prorated through May of 2007 at the rate of 5% of the annual maintenance rent for FY2006, for a total award of $98,480.69. Your decision granted an award of $36,549.55 for 2006. We therefore respectfully request that the additional incentive fees award of $61,931.14, be granted.

**II. CONCLUSION**

In light of the court's August 23, 2007 decision which found pervasive bad faith action on the part of the government in its imposition of extra-contractual obligations on North Star, the substantial evidence provided to the DCAA auditor in support of our claims, and the information provided above, we respectfully request that you reexamine your Final Decisions dated March 12, 2008 and December 7, 2007, and award North Star the additional amount of $534,209.62, plus CDA interest thereon from August 27, 2007 until paid.

Sincerely,

[signature]

Rhonda Sekyra

# EXHIBIT F

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

CERTIFIED MAIL

JUN 0 2 2008

Office of Counsel

North Star Alaska Housing Corporation
ATTN: Ms. Rhonda Sekyra
937 Harvard Avenue East
Seattle, WA 98102-4532

Re: Contracts DACA85-1-86-71 (Outlease), DACA85-9-86-27 (Agreement to Lease) and DACA85-5-88-17 (Lease), Fort Wainwright, Alaska

Dear Ms. Sekyra:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding the Reconsideration of Contracting Officer's Final Decisions dated December 7, 2007 and March 12, 2008 in association with the claim for Stove Replacements, Carpet (Failure to Maintain), Additional Payroll, and Incentive Fees on Fort Wainwright, Alaska.

If you have any questions about the enclosed COD, please contact Ms. Anne L. Burman of our Office of Counsel at (907) 753-2532.

Sincerely,

Veronica A. Hiriams

Veronica A. Hiriams
Chief, Real Estate Division
Contracting Officer

Enclosure

**FINDINGS OF FACT TO ACCOMPANY CONTRACTING OFFICER'S DECISION**

**Reexamination of Contracting Officer's Final Decisions dated December 7, 2007 and March 12, 2008**

**Stoves Replacements**
**Carpet (failure to maintain)**
**Additional Payroll**
**Incentive Fees**

**CONTRACT NUMBERS:** DACA85-1-86-71 (Outlease)
DACA85-9-86-27 (Agreement to Lease)
DACA85-5-88-17 (Lease)

**NAME AND ADDRESS OF CONTRACTOR:** North Star Alaska Housing Corporation
937 Harvard Avenue East
Seattle, WA 98102-4532

**CONTRACT DESCRIPTION:**

To design and construct 400 family housing units for military personnel and their families on Fort Wainwright, Alaska, pursuant to the Military Construction Authorization Act of 1984, 10 U.S.C. § 2828(g), as amended by the Military Construction Authorization Act of 1986, P.L. 99-167, § 801.

The outlease is a lease of government property on Fort Wainwright to the developer, beginning on June 27, 1986, for a period of 32 years, subject to termination clauses.

The Agreement to Lease provided for the Government to lease back the property, including the 400 housing units and related structures and improvements, upon completion of the project.

The Lease between North Star Alaska Housing Corporation (hereinafter North Star) and the Government is for a period of 19 years and six months, beginning November 6, 1987.

**CONTRACT AMOUNT:**

The contract amount is determined to be the combined annual total of the shelter rent and the maintenance rent costs of the 400 units over the life of the Lease. That amount excludes Work Authorization repairs and utility charges, which are paid separately by the Government. Adjustments are allowed for fluctuations in the costs of maintenance and real estate taxes.

**AMOUNT IN DISPUTE:**

$102,239.84 – Stoves
$167,728.64 – Carpet (failure to maintain)
$202,310.00 – Additional Payroll
<u>$ 61,931.14 – Incentive Fees</u>
$534,209.62 - plus interest

**THE DISPUTE:**

North Star requests payment from the Government of $534,209.62 as reconsideration of Contracting Officer's Decisions (COD), dated December 7, 2007 and March 12, 2008. This reconsideration claim includes four major claim areas (Parts B-9, B-11, C and F) as shown in North Star's claim dated August 23, 2007. North Star also requests Contract Disputes Act (CDA) interest from August 27, 2007 (receipt date of their original claim). The total sum claimed of $534,209.62 includes a total of 50 percent overhead. <u>This reexamination decision pertains only to the following parts of the claim</u>:

**Part B-9, Stoves** for which North Star alleges the Government did not take into consideration substantial evidence provided to the auditor and the Government imposed a depreciation schedule as part of its decision process for the March 12, 2008, COD.

Further, North Star noted that the calculation in the March 12, 2008 decision was in error. The calculation of the awarded amount of $5,161.00 did not include 10 percent overhead or 10 percent margin.

**Part B-11, Carpet (failure to maintain)** for which North Star contends that the Contracting Officer failed to take into account the fact that an actual damage calculation was provided to the auditor and was tested supporting their claim. North Star further stated that they provided additional calculations to the auditor for an additional $28,476.00 over the originally claimed amount. North Star also believes the COD effectively ignores the Court's express finding of bad faith.

**Part F, Additional Payroll** for which North Star contends the Defense Contract Audit Agency (DCAA) auditor's analysis of the increased payroll and the resulting COD were in error.

**Part C, Incentive Fees** for which North Star contends the December 7, 2007 COD failed to provide an incentive fees award for all of 2006 and for a partial year in 2007.

**PERTINENT CORRESPONDENCE:**

1. Reserved.
2. Reserved.
3. CDA Claim; Request for COD, dated August 23, 2007; Parts B-9, B-11 and F.
4. COD, dated December 7, 2007.
5. COD, dated March 12, 2008.
6. Request for Reexamination, dated April 29, 2008.

**PERTINENT CONTRACT PROVISIONS:**

6. LEASE NO. DACA85-5-88-17, EXHIBIT C: MAINTENANCE, REPAIR AND OPERATIONAL SERVICES STANDARDS ANNEX.

**FINDINGS OF FACT:**

**Stoves** – The Contracting Officer rendered a decision on March 12, 2008 concerning stove replacements. North Star has requested a reexamination of the COD, dated March 12, 2008 based on argument as discussed in their letter of request, dated April 29, 2008. North Star has additionally provided randomly selected copies of inspection forms, checklists and inspection memos indicating stove repair requests and stove replacements. North Star further contends the Contracting Officer imposed a depreciation schedule to arrive at her conclusions in the March 12, 2008 decision.

In the request for reexamination, North Star also alleged that the calculations for stove reimbursement used by the Contracting Officer in her COD, dated March 12, 2008 did not include 10 percent overhead or 10 percent margin. North Star recalculated the March 12, 2008 award of $6,727.00, resulting in a corrected amount of $8,516.00 including 50 percent overhead and 10 percent margin. North Star requests reimbursement of $102,239.84 for this portion of the claim.

**Carpet (failure to maintain)** – The Contracting Officer rendered a decision on March 12, 2008 concerning Carpet (failure to maintain). North Star has requested a reexamination of the COD, dated March 12, 2008 based on argument as discussed in their letter of request, dated April 29, 2008. North Star states that the decision of March 12, 2008 effectively ignores the court's express finding regarding the Government's bad faith. North Star further requests that in accordance with their letter to the DCAA auditor dated February 27, 2008, that their claim be changed from the original $94,525.00 to $123,001.00, adding $28,476.00 to the original claimed amount before adding the additional 40 percent overhead. This claimed amount totals $167,728.64 after applying the additional 40 percent overhead.

**Additional Payroll** – The Contracting Officer rendered a decision on March 12, 2008 concerning Additional Payroll. North Star has requested a reexamination of the COD dated March 12, 2008 based on argument as discussed in their letter of request, dated April 29, 2008 and attachment "A" thereto. North Star believes the DCAA auditor's analysis of the increased payroll was in error. North Star has also changed the total amount of additional payroll from $458,078.00 reflected in the August 23, 2007 claim to $424,636.00 reflected in the April 29, 2008 request for reexamination. The balance requested for this claim is $202,310.00.

**Incentive Fees** – The Contracting Officer rendered a decision on December 7, 2007 concerning Incentive Fees. North Star believes the Contracting Officer failed to provide an incentive fee award for all of 2006 and for a partial year in 2007. An additional incentive fee award of $61,931.14 is requested in this claim.

**CONCLUSION:**

**Stove Replacements** – In regards to North Star's claim for an additional $102,239.84, I have reviewed the additional documents provided. My decision of March 12, 2008 was not based on a depreciation schedule. In an attempt to determine what is normal use and wear and tear, the Contracting Officer researched the Army regulations, another Army housing maintenance contractor, and a home equity Web site for mortgages. These sources provided a consistent indication of when stoves would need to be replaced due to cumulative wear and tear. The research reflects that it is "normal" for stoves to be replaced after 12 to 15 years of use due to cumulative chips, scratches, worn burners, worn oven seals and other parts (some replacement parts discontinued), and generally no longer of a pleasing appearance. Minor incidental deterioration resulting from normal use over time, which may be acceptable when taken singly, may result in a displeasing appearance when taken cumulatively.

In review of the random inspection sheets provided by North Star for this reconsideration, it was noted that North Star's inspector marked the stove replacements as North Star's responsibility and not as occupant responsibility. No evidence was found where the Government requested or required full replacement of stoves.

I have reconsidered my decision on stoves and still find that the chips, scratches and seals that were requested by the Government to be repaired were caused by cumulative normal wear and tear over a period of time, and I find no evidence that the replacements were due to occupant

damages above what is considered to be normal wear and tear. My decision stands as stated in the COD, dated March 12, 2008 with the exception of a calculation error noted in that decision.

A review of my decision, dated March 12, 2008 reflected the calculated costs of $5,161.00 did not include 10 percent overhead and 10 percent margin. This resulted in the awarded amount of $6,727.00 to be in error. The corrected amount including a total of 50 percent overhead and 10 percent margin should have been $8,516.00. I therefore award an additional $1,789.00 plus CDA interest from August 27, 2007 until paid.

**Carpet (failure to maintain)** – In regards to North Star's claim for reimbursement for $167,728.64, I have reconsidered the evidence provided. I find evidence that North Star may have replaced the estimated amount of carpet, but not sufficient evidence that it was damaged by the occupants beyond normal wear and tear. My decision stands as stated in the COD, dated March 12, 2008. No additional funds are awarded for this part of the claim.

**Additional Payroll** – In regards to North Star's claim for an additional $202,310.00, I have considered North Star's comments and Attachment "A" to the request for reexamination dated April 29, 2008. After careful review by DCAA and myself, my decision stands as stated in the COD dated March 12, 2008. No additional funds are awarded for this part of the claim.

**Incentive Fees** – The decision on incentive fees was issued on December 7, 2007. It is the opinion of the Contracting Officer that all previously claimed incentive fee years were addressed in the December 7, 2007 COD, and correctly identified in North Star's August 23, 2007 claim, to include the partial lease year beginning November 6, 2006 thru May 5, 2007. Please refer to the lease Supplemental Agreement Nos. 31 and 32 as well as the COD dated December 7, 2007.

In regards to this reexamination COD, North Star is hereby awarded a sum total amount of $1,789.00. I further find that CDA interest should be paid on the principle amount of $1,789.00 from August 27, 2007 until paid. This decision in no way waives the United States' right to appeal the decision of the Court of Federal Claims in Case Nos. 98-168C, 02-1632C and 03-2699C that determined entitlement to some of the claims decided in this document. My determination to pay North Star certain amounts in this document is predicated on the court's determination of entitlement and is subject to a final judgment in those cases. Should any appeal of the court's decisions be successful for the United States, then the quantum determinations contained in this decision will be null and void.

This is the final decision of the contracting officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims

(except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Date: 2 JUN 08

Veronica Hiriams
Contracting Officer